**GRAVES MOTORS, INC.**

v.

**DOCAR SALES, INC.**

**Civ. A. No. 75–1357.**

United States District Court, E. D. Louisiana.

March 9, 1976.

---

J. David Forsyth, New Orleans, La., for plaintiff.

Michael F. Little, New Orleans, La., for defendant.

ALVIN B. RUBIN, District Judge:

I.

Graves Motors, Inc., a Memphis wholesale used car dealer, held NSF checks issued by Park Auto Sales, a retail used car dealer, for five used cars sold by Graves to Park.[1] Shelton, the president and controlling stockholder of Park, came to see Graves, the owner of Graves Motors, at Graves' behest. In order to settle the check claim, Shelton executed a bill of sale conveying to Graves Motors a 1972 GMC truck (or tractor), and a large trailer, which had been equipped together to haul automobiles.

The tractor was worth $11,750 or more and the trailer $2,750. Shelton and Graves agreed that Park, employing Shelton's son as a driver, would use the truck to haul automobiles sold by Graves Motors, principally to Houston, Texas. Park retained possession of the truck and used it for a trip on Graves' account to Ripley, Mississippi and for a trip to Houston.

Park had purchased the truck from defendant, Docar, when both Shelton and Lachney, Docar's President, met at an automobile auction in Alabama. Park had received a notarized bill of sale from Docar. It had purchased the trailer elsewhere. It had given Docar a check that was not honored by the drawee bank, and was returned marked NSF. Lachney telephoned Shelton repeatedly about making the check good. One week after he made his deal with Graves, Shelton drove the truck to the Alabama auction, executed a transfer of it to Docar, and left it there. Docar in turn drove the truck to the Alabama auction, executed a transfer of it to Docar, and left it there. Docar in turn drove the truck to Louisiana, where it does business. There

---

1. The case was extensively briefed and ably tried by counsel for both parties. Detailed findings of fact were made on the record at the conclusion of the trial. Only those factual considerations necessary to make the legal conclusions explicable will be repeated.

was no evidence concerning what became of the trailer.

## II.

■ Whether Graves Motors has title to the truck is determined by the law of Tennessee, the place where the transfer to Graves Motors took place. Tennessee has adopted the Uniform Commercial Code. The sections of Tennessee law that control decision are set forth in the footnotes.[2]

■ Park, having been given a bill of sale and possession of the truck by Docar, had title, albeit one that was voidable because his check was dishonored. Tennessee Code § 47–2–403. It could therefore transfer good title to a "good faith purchaser for value." Tennessee Code § 47–1–201(44). The controlling question is whether Graves was a "good faith purchaser."

"Good faith" is defined by the Tennessee Code as "honesty in fact in the conduct or transaction concerned." Graves did not know that Park's title was voidable. To this extent therefore it was in subjective good faith.

■ But honesty in fact means more than a mental belief that the seller has title. Graves knew that Park was sophisticated with respect to the value of automotive equipment, even though Park did not deal in trucks. It knew Park was in financial trouble, for Park had just given Graves three NSF checks. It had no reason to believe that Park would give equipment worth $13,500 or more to settle a debt of $9,100.[3] And it let Park retain possession of the vehicle.[4]

What constitutes "good faith" when dealing with vehicular equipment was con-

---

**2.** Tennessee Code § 47–2–403 provides:

*Power to transfer—Good faith purchase of goods—"Entrusting."*—(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though

   (a) the transferor was deceived as to the identity of the purchaser, or
   (b) the delivery was in exchange for a check which is later dishonored, or
   (c) it was agreed that the transaction was to be a "cash sale," or
   (d) the delivery was procured through fraud punishable as larcenous under the criminal law.

(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

   [Court's comment: Neither Park nor Docar was a merchant who dealt in goods of the kind involved, so paragraph (2), supra, is not applicable.]

   \*   \*   \*   \*   \*   \*

(4) The rights of other purchasers of goods and of lien creditors are governed by the chapters on Secured Transactions (chapter 9 of this title), Bulk Transfers (chapter 6 of this title) and Documents of Title (chapter 7 of this title).  [Acts 1963, ch. 81, § 1 (2–403).]

§ 47–2–402 provides:

*Rights of seller's creditors against sold goods.*—(1) Except as provided in subsections (2) and (3), rights of unsecured creditors of the seller with respect to goods which have been identified to a contract for sale are subject to the buyer's rights to recover the goods under this chapter (§§ 47–2–502 and 47–2–716).

(2) A creditor of the seller may treat a sale or an identification of goods to a contract for sale as void if as against him a retention of possession by the seller is fraudulent under any rule of law of the state where the goods are situated, except that retention of possession in good faith and current course of trade by a merchant-seller for a commercially reasonable time after a sale or identification is not fraudulent.

   \*   \*   \*   \*   \*   \*

§ 47–1–201(19) defines "good faith":

   \*   \*   \*   \*   \*   \*

   "Good faith" means honesty in fact in the conduct or transaction concerned.

   \*   \*   \*   \*   \*   \*

**3.** A difference of 25% in value where the seller advances a good explanation for the sale may not in itself put the buyer on notice. *Pool v. George*, 1947, 30 Tenn.App. 608, 209 S.W.2d 55.

**4.** In Tennessee, a retention of possession after a sale is prima facie evidence of a fraudulent transaction, and as to the seller's creditors, puts on the buyer the burden of proving that the transaction was fair and bona fide. *Hewgley v. GMAC*, 1955, 39 Tenn.App. 553, 286 S.W.2d 355, 358.

sidered in *Hollis v. Chamberlin*, 1967, 243 Ark. 201, 419 S.W.2d 116, not a Tennessee case, but cited here because it construes the U.C.C. A camper worth at least $1,000 was sold for $500 cash to a dealer. The seller advised the buyer that he wanted to sell the camper because it did not fit properly on his truck, and it obviously did not. It was on a pick-up truck, and not even tied down. The camper looked new. No questions were asked as to why it was not tied down. The seller had no bill of sale, although he had in fact purchased the camper giving an NSF check. The court felt that there were "facts and circumstances which were calculated to have aroused . . . curiosity" as to ownership of the camper. 419 S.W.2d at 119, quoting from *Gentry v. Alley*, 228 Ark. 236, 306 S.W.2d 695. "Inadequacy of the price, when very great, is of itself evidence . . . of an infirmity in [the] seller's title and consideration is to be given it, in connection with other circumstances, in determining whether a buyer is a purchaser without notice." 419 S.W.2d at 119, quoting from 77 C.J.S. Sales § 290 at 1099.

Good faith is required to be a holder in due course of a negotiable instrument, and the definition of the term is the same for that purpose as it is for determining whether a buyer of a chattel is in good faith. See Tennessee Code § 47–1–201(19); and *Third National Bank in Nashville v. Hardi Gardens Supply of Illinois, Inc.*, M.D.Tenn.1974, 380 F.Supp. 930; *McConnico v. Third National Bank in Nashville*, Tenn.1973, 499 S.W.2d 874; *Hamilton National Bank v. Swafford*, 1964, 213 Tenn. 545, 376 S.W.2d 470. But the patina placed on the definition when applied to negotiable instruments does not transfer readily to chattels. If we suppose the facts here could be made applicable to the holder of a negotiable instrument in Graves' position, we would find Graves accepting a transfer of a $13,500 bearer check for a $9,100 debt when the transferror had previously given Graves 3 personal checks that had been returned NSF, and Graves then permitting the transferor to retain possession of the transferred instrument. In those circumstances, it can hardly be considered that Graves would be found to have good title as against a subsequent transferee.

It will readily be perceived that the facts of the hypothet are distinguishable; most important, a truck is not a bearer instrument. But that distinction is the reason why the negotiable instrument cases are not ready authority for this situation.

There is a final equitable consideration that warrants mention if only because Graves suggests the equity of its position; if Docar retains the truck, Graves is ultimately deprived of nothing. It had NSF checks; it took a truck and trailer in satisfaction of them; it is no worse off than it was before its transaction with Shelton. But if Graves retains the truck, Docar will have suffered a true economic loss.

For these reasons, judgment will be entered in favor of the defendant and against the plaintiff.

The memoranda and the court's files do not appear to focus directly on the issue of the counterclaim by the defendant. If the defendant considers there is a legal basis for this claim, the issue will be presented to the court by motion within ten days. Otherwise it is denied.