**SHELL OIL COMPANY,**
Plaintiff-Appellant,

v.

**MILLS OIL COMPANY, INC., et al., Defendants,**

Citizens Bank of Byhalia, Ms., Dudley R. Moore, Jr. & John Mark Crain, Defendants-Appellees,

**D.D. Mills, Defendant-Appellant.**

No. 83–4136
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Oct. 17, 1983.

Freeland & Gafford, Deborah Hodges Bell, G.A. Gafford, Oxford, Miss., for Shell Oil.

Bonner & Birmingham, James L. Bonner, Olive Branch, Miss., for D.D. Mills.

D. Rook Moore, III, Holly Springs, Miss., Grady F. Tollison, Jr., Oxford, Miss., for defendants-appellees.

Before CLARK, Chief Judge, RUBIN and JOLLY, Circuit Judges.

CLARK, Chief Judge:

In this diversity action, Shell Oil Company and D.D. Mills appeal from the district court's order granting summary judgment in favor of Citizens Bank of Byhalia, Mississippi, and two of its officers, Dudley R. Moore, Jr., and J. Mark Crain. On appeal from the grant of summary judgment, Shell asserts that the bank lacked the good faith necessary for its security interest in Mills Oil Company's inventory to prevail over Shell's interest as an unpaid seller. We affirm.

Shell sold petroleum supplies and products to Mills Oil Company but was not paid. These supplies and products constituted a part of Mills Oil Company's inventory. D.D. Mills, James W. Conway, and Hartsell S. Conway, each of whom served in an executive capacity for Mills Oil Company during its existence, had guaranteed its obligations to Shell. Shell brought suit against Mills Oil Company and against Mills and the Conways based upon the guaranties.[1] Pursuant to a perfected security interest Citizens Bank took possession of Mills Oil Company's inventory which included products supplied by Shell for which Mills Oil Company had not paid Shell. Citizens Bank sold part of the inventory to satisfy Mills Oil Company's indebtedness to the bank.

In an amended complaint, Shell sued Citizens Bank for unjust enrichment and conversion. D.D. Mills impleaded the Conways and Mills Oil Company and later filed an amended cross-claim against Citizens Bank and two of its officers, Moore and Crain, alleging that these parties breached their duty to Mills, acted negligently, and committed fraud. The district court sustained the summary judgment motions of Citizens Bank and its officers against Mills and the bank's summary judgment motion against Shell. Shell's motion for summary judg-ment against Mills was also granted. Mills dismissed his appeal from this judgment.

I

The record established the following facts without contradiction. D.D. Mills was a wholesale jobber for Shell Oil Company during the 1950s and part of the 1960s, doing business as Mills Oil Company in Byhalia, Mississippi. Mills Oil Company purchased products from Shell and sold them to service stations in the surrounding area. In the mid-1960s, Mills entered into an agreement with James W. Conway and Hartsell S. Conway under which the Conways would operate Mills Oil Company. Mr. and Mrs. Conway had been employees of Mills Oil Company. The Conways succeeded Mills as the company's principal shareholder in 1975. After 1975, Mills remained a director of the oil company and his personal accountant, Lawrence Curbo, continued to serve as the accountant for Mills Oil Company.

From 1975 to August 1981, the Conways continued the company's practice of selling supplies and products that it purchased from Shell. During this period, Mills Oil Company maintained all its checking accounts with Citizens Bank of Byhalia, Mississippi.

A line of credit for Mills Oil Company was established by Shell based on the guaranties executed by Mills and the Conways. Shell did not take a security interest in the products it sold to Mills Oil Company. Citizens Bank loaned Mills Oil Company operating capital and secured the loan by perfecting a security interest in the oil company's inventory and accounts receivable. From 1975 to August 1981, Citizens Bank routinely honored Shell's drafts on Mills Oil Company's account even though at times the latter's account was overdrawn when the draft was presented. The bank had adequate security to cover the overdrafts at the times they occurred. Shell has not asserted that the bank exceeded the legal limits for overdrafts when it allowed Mills Oil Company to overdraw its accounts.

1. Shortly after Shell filed its complaint, Mills Oil Company and the Conways filed petitions in bankruptcy. All claims against the company and against the Conways were severed.

During July and August 1981 Shell delivered supplies and products to Mills Oil Company having a value totalling $146,134.86. Shell presented drafts on Mills Oil Company's account totalling this amount at Citizens Bank. The bank refused payment on these drafts because Mills Oil Company's account contained insufficient funds. The bank had become insecure at this time about the loans to Mills Oil Company for several reasons. When the bank requested financial information from the Conways, who were the officers of Mills Oil Company, to facilitate obtaining a Small Business Administration loan, the response was unsatisfactory. A review of Mills Oil Company's financial situation revealed that the company was selling gasoline to certain retail outlets at only one cent over the wholesale price. Mills Oil Company also sold gasoline to D.D. Mills' outlet at a similar price. The overdrafts attributed to Mills Oil Company began increasing at this time as well. Citizens Bank decided to liquidate its security to satisfy Mills Oil Company's indebtedness.

The claims asserted in this appeal are centered on actions by the parties that occurred during the spring and summer of 1981 and in particular, during the week of August 10–14. On the afternoon of August 10, 1981, W.S. Robbins, a Shell credit supervisor who oversees the accounts of jobbers, including Mills Oil Company, was informed by another Shell department that a draft for $16,804.17 drawn on Mills Oil Company's account with Citizens Bank had been dishonored because of insufficient funds. This was the first draft drawn by Shell on Mills Oil Company's account that was dishonored by Citizens Bank. Robbins called Mills Oil Company and talked with Rita Hobbs, a secretary. He learned from Hobbs that the Conways were at a jobbers convention in Nashville, Tennessee. Hobbs assured Robbins the company had sufficient funds to cover the overdraft. Robbins requested that a certified check be sent to Shell to cover the overdraft. Hobbs responded that a certified check would be sent. Prior to talking with Robbins, Hobbs had called J. Mark Crain, Executive Vice-President of Citizens Bank, requesting that he call to assure Shell that the overdraft problem would be corrected. Crain did call but was unable to reach Robbins. Robbins returned Crain's call. Crain stated that the draft was good and that it should be resubmitted. Robbins replied that Shell's policy in this situation was to secure certified funds, which was being done through Hobbs. According to Robbins, he did not request certified funds from the bank. Also on August 10 Robbins reviewed the file on Mills Oil Company to determine whether its current operations should be maintained. Based upon the lack of prior returned drafts, the assurance by Hobbs that a certified check would be sent, and the statement by Crain that the overdraft was good at that time, Robbins decided not to halt Mills Oil Company's operations with Shell.

The following morning, August 11, Robbins called Hobbs to ascertain the status of the certified check. Hobbs stated that the check had not been mailed. That afternoon, Robbins learned that a second draft on Mills Oil Company's account had been returned. Robbins immediately notified Shell's West Memphis plant, where Mills Oil Company picked up supplies, to prevent any representative of Mills Oil Company from loading any supplies. Hobbs still maintained that a certified check would be sent.

Bank officers contacted the Conways in Nashville, requesting that they return to Mississippi to work out the problems with Mills Oil Company. On August 11, the bank decided to execute on its security agreement and sell Mills Oil Company's inventory to satisfy the company's indebtedness to the bank. At 7:00 a.m. on August 12, the Conways met with Moore and Crain at the bank's offices. The Conways, Moore, Crain, counsel for the bank, and Lawrence Curbo attended the meeting. The morning was spent discussing the financial situation of Mills Oil Company. In the afternoon, the Conways executed a "Surrender and Release" document, which enabled Citizens Bank to take possession of the inventory of Mills Oil Company. The Conways signed this document after reading it and upon the advice of counsel. The bank sold enough of

the inventory to satisfy Mills Oil Company's indebtedness.

Robbins learned of the execution of the document the following day, August 13. A meeting between representatives of Shell, Citizens Bank, and Mills Oil Company was arranged for August 14. During the August 14 meeting at the bank's offices, Moore and Crain indicated that the liquidation of the inventory was being undertaken. Shell was represented at this meeting by Robbins and Mike Carpenter, whose position as jobber representative for Shell entailed working with jobbers on advertising, sales, sales promotion, and real estate acquisition. Neither Robbins nor Carpenter made an offer to purchase any of Mills Oil Company's inventory because they believed the bank had already disposed of it. Carpenter stated during the meeting that the bank should have informed Shell of its practice of honoring overdrafts by Mills Oil Company. After unsuccessfully demanding payment for the supplies, Shell filed suit.

## II

This diversity case is controlled by Mississippi's version of the Uniform Commercial Code. Shell's remedies as an unpaid credit seller are set forth in Miss.Code Ann. § 75–2–702 (1972).[2] Shell bases its right to relief on the interaction between § 75–2–702(3) and Miss.Code Ann. § 75–2–403 (1972).[3] Section 75–2–702(3) provides that an unpaid credit seller's right to reclaim is subject to the rights of a good faith purchaser under § 75–2–403. Section 75–2–403(1) allows a party with voidable title to transfer good title to a good faith purchaser for value. Mills Oil Company, which bought supplies on credit from Shell, received voidable title to the supplies despite having had its checks dishonored by Citizens Bank. Based on § 75–2–403, Mills Oil Company could transfer title to its invento-

**2.** Miss.Code Ann. § 75–2–702 (1972) provides in full:

(1) Where the seller discovers the buyer to be insolvent he may refuse delivery except for cash including payment for all goods theretofore delivered under the contract, and stop delivery under this chapter (Section 2–705) [§ 75–2–705].

(2) Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten (10) days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three (3) months before delivery the ten-day limitation does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay.

(3) The seller's right to reclaim under subsection (2) is subject to the rights of a buyer in ordinary course or other good faith purchaser under this chapter (Section 2–403) [§ 75–2–403]. Successful reclamation of goods excludes all other remedies with respect to them.

The parties have not contested whether the requirements of § 75–2–702(2) were met. We assume, without deciding, that those requirements were satisfied.

**3.** Miss.Code Ann. § 75–2–403 (1972) provides in full:

(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though

(a) the transferor was deceived as to the identity of the purchaser, or

(b) the delivery was in exchange for a check which is later dishonored, or

(c) it was agreed that the transaction was to be a "cash sale," or

(d) the delivery was procured through fraud punishable as larcenous under the criminal law.

(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

(3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

(4) The rights of other purchasers of goods and of lien creditors are governed by the chapters on Secured Transactions (Chapter 9), Bulk Transfers (Chapter 6) and Documents of Title (Chapter 7).

ry to a good faith purchaser for value. For Citizens Bank to qualify under § 75–2–403, it must have "purchased" the supplies "for value" and in "good faith." Under the Uniform Commercial Code the term "purchaser" is defined to include a secured party. Miss.Code Ann. § 75–1–201(32), (33) (1972). Shell conceded that the bank held a perfected security interest in Mills Oil Company's inventory. A secured party gives "value" when it takes an after-acquired interest in exchange for a previous loan. Miss.Code Ann. § 75–1–201(44) (1972). The bank's security interest contained an after-acquired property clause, which included Mills Oil Company's inventory. Therefore, the issue narrows to whether Citizens Bank acted in good faith.

■ This case is before us on motions for summary judgment. Summary judgment is appropriately granted when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). Shell contends that because the bank knew that Shell had not been paid for the products and supplies purchased by Mills Oil Company, the bank did not act in good faith when it disposed of Mills Oil Company's inventory. The good faith of the bank is obviously a material fact. What we must determine is whether the bank's knowledge of Shell's position as an unpaid seller raises a genuine issue as to its good faith.[4]

In *In re Samuels & Co.*, 526 F.2d 1238 (5th Cir.) (en banc), *cert. denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976), C.I.T. loaned Samuels & Co. money to purchase cattle. C.I.T. secured its loan by perfecting a security interest in Samuels' after-acquired inventory, which consisted of its cattle. Samuels' checks to its sellers were dishonored when C.I.T., after deeming itself insecure, refused to advance Samuels' approximately $184,000. Samuels then filed

bankruptcy. Samuels' sellers had conveyed cattle to Samuels immediately prior to the filing of the bankruptcy petition. The petition left these sellers unpaid. The court noted that neither the referee in bankruptcy nor the district court found that "C.I.T.'s knowledge of Samuels' business extended to knowledge of the debtor's obligations to third party creditors." *Id.* at 1243. The en banc court in dicta stated that even if C.I.T. knew that Samuels' sellers were unpaid, C.I.T.'s good faith would be "unaffected." *Id.* Although noting that the common law required lack of knowledge to achieve bona fide purchaser status, and that this requirement is carried forward in certain Code sections, the court concluded that "the Code's definition of an Article Two good faith purchaser does not expressly or impliedly include lack of knowledge of third-party claims as an element." *Id.* at 1243–44. C.I.T.'s decision to halt funding was determined to be clearly reasonable. *Id.* at 1244. The Code definition of good faith is "honesty in fact." *E.g.*, Miss.Code Ann. § 75–1–201(19) (1972). *Samuels & Co.* noted that this concept "hardly requires a secured party to continue financing a doomed business enterprise."[5]

The authorities Shell cites as support for its contention that a party with knowledge that goods are unpaid lacks good faith are distinguishable. In *Blackhawk Pontiac Sales, Inc. v. Orr*, 84 Ill.App.3d 456, 39 Ill. Dec. 746, 405 N.E.2d 499 (1980), Orr, an unlicensed used car dealer, bought six cars from Futrell, a licensed dealer. The checks Orr gave Futrell for each car were dishonored. When contacted by Futrell, Orr offered to "float" Futrell some cars to cover the debt created by the bad checks. Futrell agreed to Orr's proposal. Orr purchased eight cars from Blackhawk Pontiac Sales, who accepted Orr's checks. Orr delivered these cars to Futrell, who gave Orr checks for the cars. In turn, Orr endorsed the

---

**4.** Shell has not alleged that the bank did not dispose of the inventory in a commercially reasonable manner.

**5.** Courts have repeatedly emphasized that unpaid sellers can normally prevent their loss by perfecting a purchase money security interest.

*E.g., In re Samuels & Co.*, 526 F.2d at 1244; *United States v. Wyoming Nat'l Bank*, 505 F.2d 1064, 1068 (10th Cir.1974); *Kennett-Murray & Co. v. Pawnee Nat'l Bank*, 598 P.2d 274, 278 (Okl.Ct.App.1979).

checks back to Futrell to eradicate the original debt Orr owed to Futrell. Later the checks made out to Blackhawk were also dishonored, and Blackhawk demanded that Futrell return the cars bought by Orr from Blackhawk. Futrell argued that he possessed good title to the Blackhawk cars as a good faith purchaser for value, relying on Illinois' version of § 2–403 of the Uniform Commercial Code. The Illinois court rejected Futrell's contention, concluding that because Futrell knew Orr was without funds and because Orr and Futrell had agreed that Orr would "float" Futrell some cars, Futrell could not have believed that Orr had made a bona fide purchase from Blackhawk. 39 Ill.Dec. at 749, 405 N.E.2d at 502. Futrell clearly "knew when Orr delivered the eight cars to him from [Blackhawk] that (a) these cars were not paid for and (b) that the whole transaction was simply for the purpose of wiping out Orr's previous debt to Futrell." *Id.*[6]

Shell also relies on *Graves Motor, Inc. v. Docar Sales, Inc.*, 414 F.Supp. 717 (E.D.La. 1976), as authority for the proposition that even in the absence of actual knowledge, an awareness of suspicious circumstances indicating that a seller is unpaid precludes a party from claiming good faith status. In *Graves Motors,* Park bought five cars from Graves with worthless checks. To settle this claim, Park conveyed to Graves a truck and trailer worth $14,500. Park retained possession of the truck, which Park used on behalf of Graves' business. Prior to these transactions, Park had purchased the truck from Docar with a check that was later dishonored. One week after making the deal with Graves, Park transferred the truck back to Docar. *Id.* at 718.

The court noted that under § 2–403 of the Tennessee Uniform Commercial Code, Park had voidable title to the truck. Therefore, he could have transferred the truck to Graves if the latter purchased it for value and in good faith. Only Graves' good faith was contested. *Id.* The court

held that "honesty in fact," the definition of good faith under the Code, "means more than a mental belief that the seller has title." *Id.* The court concluded that because Graves knew of Park's sophistication with respect to the value of automotive equipment and because Graves knew of Park's financial predicament, Graves could not reasonably have believed that Park would give equipment worth at least $14,-500 to settle a $9,100 debt. Significantly, Graves allowed Park to retain possession of the vehicle. *Id.* The court pointed out that under Tennessee law, Park's retention of possession was prima facie evidence of a fraudulent transaction and placed on Graves the burden of proving as to Docar that the transaction was fair and bona fide. *Id.* at 719 n. 4. Graves was held not to be a good faith purchaser.

In neither *Graves Motors* nor *Blackhawk* did the potential good· faith purchasers, Graves and Futrell, have perfected security interests in the goods transferred. Citizens Bank did. In both *Graves Motors* and *Blackhawk* several connected transactions determined the purchaser's good faith. In both cases transactions with the potential good faith purchaser were consummated to wipe out a previous debt. The facts surrounding these transactions created suspicious circumstances that legitimately brought into question the good faith of the purchasers. Under the circumstances present in the case at bar, knowledge by Citizens Bank that Shell was unpaid does not impair the former's good faith.

Shell also relies on *Burk v. Emmick,* 637 F.2d 1172 (8th Cir.1980). In *Burk,* the plaintiff-seller contracted to sell cattle to the defendant-buyer. A major part of the purchase price would be paid by a draft drawn upon the co-defendant bank, which had a preexisting security interest in the buyer's after-acquired property. Prior to delivery, the defendant bank orally guaranteed the seller that the buyer had sufficient funds to cover the draft. The seller deliv-

---

**6.** The Illinois court also held that Futrell did not give value for the cars "floated" by Orr. 39   Ill.Dec. at 749–50, 405 N.E.2d at 502–03.

ered the cattle but the bank refused to accept the draft presented by the seller. The seller reclaimed the cattle and resold them but for less than the original contract price. The seller sued the bank on a promissory estoppel theory, alleging that he detrimentally relied on the bank's oral assurance that the buyer had funds sufficient to cover the draft. The bank argued that its interest was superior to the sellers because of the preexisting security interest. The court of appeals noted that the bank's argument had been rejected when the jury determined that the bank did not act in good faith. *Id.* at 1174. In the case at bar Shell never had an oral or written guarantee from the bank that Mills' drafts would be paid. Indeed, Shell never even resubmitted either unpaid draft to the bank. *Burk* does not support Shell's position.

Shell has not contested the propriety of the bank's process of dishonoring Mills' drafts nor does it claim the mechanics of the process amounted to a lack of good faith on the bank's part. Rather, Shell argues only that Citizens Bank's knowledge that Shell was unpaid creates a genuine issue as to the bank's good faith. We reject Shell's argument and affirm the lower court's order. Therefore, *Central Bank of Alabama v. American Charms, Inc.,* 149 Ga. App. 218, 253 S.E.2d 857 (1979), is distinguishable. Central Bank, which held a security interest in the wholesaler's inventory, sued American, the seller, for conversion. American recovered goods sold to the wholesaler after the wholesaler's check was dishonored by Central Bank. The court held that there was a material issue of fact as to whether Central Bank acted in good faith because the bank did not dishonor the wholesaler's check until eighteen days after American deposited it. 253 S.E.2d at 858.

### III

■ D.D. Mills alleges that the bank and two of its officers had a duty "to protect Mills against the consequences flowing from his contingent liability as a guarantor of Shell Oil Company." Mills also asserts claims for fraud and negligence against the

bank, Crain, and Moore. Mills contends that the bank officers should have notified Mills that Mills Oil Company's overdrafts were being honored. Mills' contentions are meritless. No precedent is cited which establishes any such duties. No agreement, express or implied, obligated the bank to notify or advise Mills regarding the financial affairs of Mills Oil Company. Mills was a director of Mills Oil Company until the company declared bankruptcy in 1981. Mills' accountant was also the accountant for Mills Oil Company; therefore, Mills had ready access to any information regarding the financial condition of Mills Oil Company. Mills was not a guarantor of Mills Oil Company's debts to Citizens Bank but he was a creditor of the company and had security to protect his interest. That Mills chose not to protect that interest creates no heightened obligation on the bank's part to protect it.

■ Mills' argument that the bank and its officers committed fraud is equally meritless. The Mississippi Supreme Court has listed the nine elements of common-law fraud:

(1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon. (9) And his consequent and proximate injury.

*Gardner v. State,* 235 Miss. 119, 108 So.2d 592, 594 (1959), *quoting* 37 C.J.S. *Fraud* § 3, at 215. At the minimum, the first requirement is not satisfied because Mills has not alleged that the bank made a representation. Rather, Mills has alleged that by failing to inform Mills of the financial condition of Mills Oil Company, the bank committed fraud. We affirm the lower court's order granting summary judgment.

AFFIRMED.