**Thomas F. PUCKETT and Mildred M. Puckett, Plaintiffs–Appellants,**

v.

**RUFENACHT, BROMAGEN & HERTZ, INC., Defendant–Appellee.**

No. 89–4504.

United States Court of Appeals, Fifth Circuit.

June 5, 1990.

Rehearing Denied June 25, 1990.

Allen W. Perry, Fred Krutz, III, and Ronald D. Collins, Forman, Perry, Watkins, Krutz & McNamara, Jackson, Miss., for plaintiffs-appellants.

William J. Nissen, Sidley & Austin, Chicago, Ill., and Carey Varnado, Easterling & Varnardo, Hattiesburg, Miss., for defendant-appellee.

Before BROWN, WILLIAMS and JONES, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This case arose out of the commodity futures trading tragedy of Dr. and Mildred Puckett. The trial court granted summary judgment in favor of Rufenacht, Bromagen & Hertz, Inc. (RB & H), the broker, on all counts below. We affirm the summary judgment dismissing the Pucketts' claims that RB & H committed common law fraud or violated § 4b of the Commodities Exchange Act (CEA), 7 U.S.C. § 6b. However, we certify the state law questions of negligence and breach of fiduciary duty to the Supreme Court of Mississippi.

*Standard of Review*

Our review of a grant of summary

judgment is *de novo*.[1] The standard for the grant or denial of a summary judgment is the absence or presence (respectively) of an actual dispute as to a material fact. All facts and inferences are viewed in the light most favorable to the non-moving party and all reasonable doubts are resolved in that party's favor. If factual issues or conflicting inferences exist, the court is not to resolve them; rather, summary judgment must be denied. In making its determination, the court may look at "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." F.R.Civ.P. 56(c).

### From Pork Bellies to Standard & Poors

Read in the light most favorable to the Pucketts, the facts are as follows. RB & H, a commodity brokerage firm, operates a branch office in Hattiesburg, Mississippi, where the Pucketts reside. Dr. Puckett is a retired pathologist who successfully ran his own pathology lab, with gross revenues of $8,000,000 per year, in Hattiesburg.

Dr. Puckett has continuously traded some form of securities from 1955–56 to the present. He had previously traded commodities on two occasions. He traded with Merrill Lynch in the late 1950's or early 1960's and lost about $40,000. He also traded for a couple of weeks with Paine Webber in mid–1984 and lost about $1,000.

The Pucketts learned of RB & H in July 1984 at a dinner party. Roger Parker, the manager of the Hattiesburg branch of RB & H, made a presentation about trading commodities in order to acquire customers. Both of the Pucketts opened accounts. They filled out applications on which they stated the amount of risk capital available for commodities trading as $25,000 (for Dr. Puckett) and $15,000 (for Mrs. Puckett). Both Dr. and Mrs. Puckett signed Risk

Disclosure Statements before they traded. (R. 248. 253). Both Pucketts acknowledged by signing that they "examined this document and underst[ood] fully the advice contained therein."

The Pucketts' accounts were non-discretionary. In other words, they made all the trading decisions themselves[2]—RB & H could not make unauthorized trades on their behalf. Dr. Puckett spent several days each week at RB & H's offices where he used a quote machine and a news service provided on a screen. He also received comments from the floor of the Chicago Mercantile Exchange. Dr. Puckett regularly received statements (confirmation slips and monthly account statements) which he reviewed.

According to his own deposition testimony and affidavits, Dr. Puckett understood the risks of trading commodity futures contracts. (R. 223–25). Dr. Puckett knew that a risk accompanied every trade and that he had to incur this potential risk in order to reap the potential rewards of large gains. (R. 211–12). Dr. Puckett understood that while some contracts had daily price limits (i.e. limits on how far up or down they could move in a single day), others had no limits and the risk of loss each day on such contracts was unlimited. (R. 221–23). He knew that the potential loss on the Standard & Poors 500 Stock Index Contract (S & P Index) was unlimited. (R. 222–23). Initially, Dr. Puckett was unaware of how quickly the S & P 500 Index could move in a day, but he became aware of this risk when he lost $65,000 trading this contract in one day. (R. 223–24). He continued to trade this contract after learning of this risk. *Id.*

Dr. Puckett had both successful and unsuccessful trades throughout the thirty-eight months he traded with RB & H. Parker testified that he never tried to influence Puckett in his choice of trades. Dr.

---

**1.** *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1030 (5th Cir. Unit B 1982) ("In reviewing a decision granting or denying summary judgment, this court applies the same legal standards as those that control the district court in

determining whether summary judgment is appropriate.") (Citations omitted).

**2.** From the record, it appears that Mrs. Puckett did her own trading for the first month or so. It is undisputed that from that time on Dr. Puckett traded both accounts himself.

Puckett agreed and testified that the initial idea for each of his trades was his own. Parker always properly carried out Dr. Puckett's orders. Puckett could not identify any statements made or information provided by Parker which was untrue. (R. 203). Dr. Puckett believes that any advice which Parker gave about trades was in good faith even if it didn't pan out. (R. 204).

The initial risk figures of $25,000 and $15,000 which the Pucketts listed in their customer applications became unimportant to Dr. Puckett once he began trading and he decided to risk more money as time went on. (R. 212, 236). Dr. Puckett knew his losses on the day they were incurred. (R. 210–11). He generally covered those losses with a check that afternoon or the next morning. (R. 206). Dr. Puckett occassionally liquidated securities at another firm to cover his losses. On those occassions, RB & H always waited the five days it took the security transaction to clear before cashing his check. Eventually, Dr. Puckett began liquidating his pension plan to cover his commodity trading losses. The checks did not indicate the source of funds and Dr. Puckett never informed Parker that he was funding his losses by liquidating his pension fund. (R. 225, 235–38, 629–54).

Dr. Puckett knew that RB & H received a commission for each trade he made. His monthly account statements showed those amounts. (R. 202).

Dr. Puckett quit trading in September 1987 on the advice of his son. His accountant had informed his son of the state of Dr. Puckett's finances. Dr. Puckett's son told him to stop. By this time, Dr. Puckett had lost over $2,000,000. (R. 229–30). Dr. Puckett told Parker he was quitting because he had lost enough. He made no complaints about the way his account was handled and promptly paid his last loss. (R. 204–05, 214).

Thereafter, the Pucketts brought suit to recover trading losses, punitive damages and attorneys' fees. Their Complaint was based on the following counts and allegations: (i) an alleged violation of § 4b of the CEA, 7 U.S.C. § 6b, (ii) breach of fiduciary duty, (iii) fraudulent inducement, fraudulent concealment, and actual fraud, (iv) constructive fraud, (v) negligence, (vi) breach of good faith and fair dealing and the just and equitable principles of trade, and (vi) overreaching that was tantamount to fraud. The trial judge held for RB & H on each of these counts and dismissed the Pucketts' suit with prejudice.

On appeal, the Pucketts argue that genuine issues of material fact remain to be resolved. The three issues they raise are: (i) fraud and a violation of CEA § 4b, (ii) breach of fiduciary duty, and (iii) negligence. This opinion affirms the trial court's disposition on the fraud issues and certifies the questions of state law to the Mississippi Supreme Court.

### Risking it All

■ The Commodity Exchange Act (CEA), 7 U.S.C. § 1, *et seq.*, makes it unlawful for any person, "in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, ..."

(A) to cheat or defraud or attempt to cheat or defraud such other person;

(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; ....

7 U.S.C. § 6b (West Supp.1990) (CEA § 4b).

The Pucketts allege that this provision was violated in three ways: (i) RB & H misrepresented material facts, (ii) RB & H failed to disclose the risks of commodities trading, and (iii) RB & H had a duty to determine that Dr. Puckett was not suit-

able to trade commodities and to prevent him from doing so.

The elements of a fraud action under § 4b are derived from the common law action for fraud. *Greenwood v. Dittmer,* 776 F.2d 785, 789 n. 4 (8th Cir.1985); *Horn v. Ray E. Friedman & Co.,* 776 F.2d 777, 780 (8th Cir.1985).[3] Several circuits have defined fraud in the CEA context.

The Eighth Circuit has held that the test for culpable fraud is the making of a false representation of material fact with the knowledge or belief on the maker's part that the representation is false. *Horn,* 776 F.2d at 780. The misrepresentation must be made with the intent to induce reliance and the plaintiff must show damages resulting from justifiable reliance. *Id.* The Second and Tenth Circuits have joined the Eighth in requiring a "degree of intent beyond carelessness or negligence." *Hill v. Bache Halsey Stuart Shields Inc.,* 790 F.2d 817, 822 (10th Cir.1986) (and cases cited therein); *Haltmier v. CFTC,* 554 F.2d 556, 562 (2d Cir.1977). The Ninth Circuit likewise requires "an intentional act or careless disregard for the statutory requirement." *Wasnick v. Refco Inc.,* 896 F.2d 556 (9th Cir.1990),[4] *citing, CFTC v. Savage,* 611 F.2d 270, 283 (9th Cir.1979). The First Circuit has recognized a specific scienter requirement in § 4b. *First Commodity Corp. of Boston v. CFTC,* 676 F.2d 1, 4 (1st Cir.1982). The D.C. Circuit holds that recklessness is enough. *Drexel Burnham Lambert Inc. v. CFTC,* 850 F.2d 742, 748 (D.C.Cir.1988) ("reckless inattention to obvious dangers to a client's interests in arranging a purchase or sale for the client's account triggers liability under section 4b.").

The Pucketts' allegations of fraud avail them not. They are unable to meet the standards of common law fraud in Mississippi, *see supra* note 3, or the standard of any of the circuits that have addressed the question of fraud in violation of § 4b. Dr. Puckett's own testimony negates the existence of any misrepresentation. He says:

Q. Do you know of any information you ever received from Roger Parker that you later found out that you believe was untrue?

A. No.

Q. And do you know of any statements Roger Parker ever made to you that you now believe were untrue?

A. No.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Let me start over. You understand with a market prediction that's someone's best guess, right?

A. Yes.

Q. And, so, then, it's hard to say whether that's true or untrue?

A. That's right.

Q. And you don't have any reason to believe that any predictions made to you by RB & H were made in bad faith; do you?

A. No.

Q. And in terms of factual statements, you don't know of any made by anybody at RB & H that you believe were untrue; do you?

A. No.

(R. 203–04).

Thus, their assertions boil down to a claim that RB & H, or its agent Parker, failed to inform them sufficiently of the risks of trading commodities futures. While we accept that the risk inherent in trading commodities is a material fact and that misrepresentations or omissions in this regard may subject a broker to liability

---

**3.** As an example of what constitutes common law fraud, a cause of action in Mississippi requires:

(1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely

thereon. (9) And his consequent and proximate injury.
*Shell Oil Co. v. Mills Oil Co.,* 717 F.2d 208, 214 (5th Cir.1983), *citing, Gardner v. State,* 235 Miss. 119, 108 So.2d 592, 594 (1959).

**4.** Although the *Wasnick* case "is not appropriate for publication and may not be cited to or by the courts of [the Ninth] circuit except as provided by Ninth Circuit Rule 36–3," we are free to cite it and rely on its persuasive authority.

under § 4b, *see Clayton Brokerage v. CFTC,* 794 F.2d 573, 578 (11th Cir.1986), we agree with the trial court that no evidence of such culpable conduct was presented. In the first place, both Dr. and Mrs. Puckett signed Risk Disclosure Statements when they opened their accounts. These statements informed the Pucketts of the riskiness of commodity futures trading.[5]

■ While the presentation of a Risk Disclosure Statement may not absolve a broker of all duty to disclose additional material information about risk, the amount of additional disclosure required varies depending on the facts and circumstance of trading and the relationship between the broker and the client. *Clayton Brokerage,* 794 F.2d at 580. In this situation, the broker was faced with a man who had previously traded commodities futures and had continuously traded securities for approximately 30 years. In addition, Dr. Puckett was an educated man and a successful businessman capable of understanding the concepts embodied in the Risk Disclosure Statement. Finally, Dr. Puckett, who personally ordered all of the trades for both his and his wife's accounts admits that he was aware of the losses he was incurring, understood the risk of each trade, and chose to take risks in order to try for profits.

Q. Now, when you did incur losses in your account at RB & H, you were aware of those losses on the day they occurred; is that correct?

A. Yes.

Q. And it was your decision to continue to trade each day after that; is that right?

A. Yes.

Q. And you understood, didn't you, the risk that went along with each particular trade you did?

MR. KRUTZ:

Object to the form of the question. You can answer it, though.

A. Yes.

Q. And you also understood with each trade there was a potential profit that could be made on that trade; is that right?

A. Yes.

\*   \*   \*   \*   \*   \*

Q. It's true isn't it, that when you made a trade, you knew there was both a potential risk and a potential reward to that trade?

A. Yes.

Q. So, in order to obtain the potential reward, you knew you had to incur that potential risk; is that right?

A. That's right.

(R. 210–212).

Thus, we agree with the trial court that there was no evidence that the Pucketts were the victims of fraud. Based on the

---

5.  The risk of loss in trading commodity futures contracts can be substantial. You should therefore carefully consider whether such trading is suitable for you in light of your financial condition. In considering whether to trade, you should be aware of the following:

(1) You may sustain a total loss of the initial margin funds and any additional funds that you deposit with your broker to establish or maintain a position in the commodity futures market. If the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional margin funds, on short notice, in order to maintain your position. If you do not provide the required funds within the prescribed time, your position may be liquidated at a loss, and you will be liable for any resulting deficit in your account.

(2) Under certain market conditions, you may find it difficult or impossible to liquidate a position. This can occur, for example, when the market makes a "limit move."

(3) Placing contingent orders, such as a "stop-loss" or "stop-limit" order, will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such orders.

(4) A "spread" position may not be less risky than a simple "long" or "short" position.

(5) The high degree of leverage that is often obtainable in futures trading because of the small margin requirements can work against you as well as for you. The use of leverage can lead to large losses as well as gains.

This brief statement cannot, of course, disclose all the risks and other significant aspects of the commodity markets. You should therefore carefully study futures trading before you trade.

(R. 248, 253).

undisputed testimony of Dr. Puckett himself, no misrepresentations were made and no material omissions occurred. Although fraud may occur during the solicitation process, because of insufficient disclosure, *see Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 111 (2d Cir.1986), the Pucketts do not present such a case. Dr. Puckett knew the risk of loss from his previous trading experiences, he read and understood the Risk Disclosure Statement, and he was aware of the risk of each trade he made.

■ The strongest federal claim the Pucketts raised relates to Dr. Puckett's S & P Index trading. He testified that at the time he began trading on this index, he was unaware of the speed at which the contract could move, (R. 223–24), although he was aware that losses were unlimited because there was no limit price. (R. 222). However, Dr. Puckett learned the risk of this contract when he lost $65,000 in one day trading it and he continued to trade S & P index contracts thereafter. (R. 223–25). "[A] claimant who suffers losses after learning the risk of trading cannot recover for earlier reliance upon misrepresentations about risk." *Clayton Brokerage*, 794 F.2d at 578–79.

■ The Pucketts' final claim that § 4b was violated arises from RB & H's alleged failure to determine their suitability to trade commodity futures. Although there has historically been some debate about the existence of a "suitability rule" implicit in § 4b, the Commodity Futures Trading Commission (CFTC) ended the debate with its decision in *Phacelli v. ContiCommodity Services, Inc.*, Comm.Fut.L.Rep. (CCH) ¶ 23,250 (CFTC 1986). There the CFTC held that a commodities broker had no duty to determine his client's suitability to trade.[6]

> Based on Commission precedent and the great weight of authority in the courts, we hold that a commodity professional does not violate Section 4b merely because he fails to determine whether a customer is suitable for commodity trading. In other words, a customer who makes a knowing and meaningful election to undertake the risks of commodity futures trading cannot recover his losses by claiming under Section 4b that his account executive should have warned him that he was unsuitable for such a risk.

Comm.Fut.L.Rep. ¶ 23,250 at 32,674. The Commission has followed the *Phacelli* case since its pronouncement,[7] as has at least one federal court.[8] Based on this authority, we hold on this record that Parker and RB & H had no duty to determine if Dr. Puckett was a suitable candidate for commodity futures trading.

### *"Hedging" Our Bets*

■ In addition to their fraud claims, the Pucketts raised two exclusively state law claims: negligence and breach of fiduciary duty.[9] The Pucketts' state-based negligence claim is independent of their argu-

---

**6.** The Commission, at ¶ 32,673–74, cited *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28, 34 (1st Cir.1986); *Myron v. Hauser*, 673 F.2d 994, 1005 (8th Cir.1982); *Trustman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, Comm. Fut.L.Rep. (CCH) ¶ 22,490 at 30,168, 1985 WL 28 (C.D.Cal.1985); *Shearson Loeb Rhoades, Inc. v. Quinard*, Comm.Fut.L.Rep. (CCH) ¶ 21,686 at 26,622 (C.D.Cal.1983); *Applegate v. Dean Witter Reynolds*, Comm.Fut.L.Rep. (CCH) ¶ 21,881 at 27,748 (S.D.Fla.1983); *J.E. Hoetger & Co. v. Asencio*, 558 F.Supp. 1361, 1364 (E.D.Mich.1983); and *Sherry v. Diercks*, 29 Wash.App. 433, 628 P.2d 1336 Comm.Fut.L.Rep. (CCH) ¶ 21,221 at 25,087 (1981).

**7.** *See Unsdorfer v. Murlas Commodities*, Comm. Fut.L.Rep. (CCH) ¶ 23,412, at 33,095 (CFTC 1986); *Knutson v. Dean Witter Reynolds*, Comm. Fut.L.Rep. (CCH) ¶ 23,949, at 34,326 (CFTC 1987); *Foster v. First Commodity Corp. of Boston*, Comm.Fut.L.Rep. (CCH) ¶ 23,970, at 34,405 (CFTC 1987).

**8.** *See Mayoza v. Heinold Commodities, Inc.*, 871 F.2d 672, 678 n. 3 (7th Cir.1988). The trial court below also relied on *Phacelli*. The Ninth Circuit in *Wasnick, supra*, refused to entertain a suitability claim because there was no Ninth Circuit law in support of the proposition.

**9.** The CEA does not preempt common law remedies for aggrieved investors. *Kotz v. Bache Halsey Stuart, Inc.*, 685 F.2d 1204, 1207–08 (9th Cir.1982).

ment that RB & H's failure to determine suitability was fraudulent.[10] However, the Pucketts do argue that RB & H had a common law duty to monitor their suitability which it negligently breached.

The crux of the Pucketts' negligence claim is that RB & H was negligent in failing to follow both its own and industry standards in its dealings with the Pucketts. They assert that the duty thus arising is independent of the duties arising under the CEA and that a duty exists with regard to nondiscretionary accounts. As an example of their arguments, the Pucketts contend that RB & H was negligent in allowing Dr. Puckett to trade S & P Index futures because (i) Parker knew little or nothing about such contracts, (ii) Parker knew Puckett had no experience in trading this kind of contract, and (iii) Parker knew that Dr. Puckett had already lost nearly $500,-000 trading futures. In short, the Pucketts assert that RB & H's negligence exposed them to the harm they suffered. The Pucketts were unable to cite any Mississippi law to bolster their position, nor was RB & H able to cite any controlling Mississippi law to refute it.[11]

The Pucketts also assert that RB & H breached its fiduciary duty to them. From the briefs it appears that the Mississippi Supreme Court has not defined the scope of the fiduciary duties a broker owes to its commodity futures customers.[12] Although there is some Fifth Circuit law on the question, we are not satisfied that these cases apply Mississippi law or resolve the question the way the Mississippi courts would.

We may, in our *Erie* role, decide these unsettled questions of state law in the way in which it appears to us the Supreme Court of Mississippi would do had these questions come before it. However, the course that the Mississippi Court would take is sufficiently unclear to us that, rather than risk pronouncing a result which that court later would not follow, we elect to certify the questions directly to the Mississippi Supreme Court for an authoritative answer.[13]

Having determined to certify these questions to the Supreme Court of Mississippi,[14] it is the custom and practice of this Court to call on counsel to submit a joint proposed statement of facts and proposed

---

**10.** The Pucketts have relied very heavily on the trial court's opinion in *Wasnick v. Refco, Inc.,* Comm.Fut.L.Rep. (CCH) ¶ 24,315 (W.D.Wash. 1988). That case has been overruled by the Ninth Circuit. *Wasnick v. Refco, Inc.,* 896 F.2d 556 (9th Cir.1990). Although both Wasnick opinions provide persuasive arguments for the positions they adopt, neither is controlling on the negligence question because they applied Washington law. Upon certification, it will be up to the Mississippi Supreme Court to determine its own law in this regard.

**11.** RB & H cites the case of *Shell Oil Co. v. Mills Oil Co.,* 717 F.2d 208 (5th Cir.1983), for the proposition that because Dr. Puckett knew his own finances and the impact of trading on them, RB & H owed him no duty. The Mississippi Supreme Court might well decide that the duty a bank owes to the director of a corporate client differs from the duty a broker owes to his client.

RB & H has also raised an assumption of the risk defense. Once again, the applicability of this doctrine to the facts of this case must be decided by the Mississippi Supreme Court.

**12.** The trial court relied on *Leib v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 461 F.Supp. 951, 953 (E.D.Mich.1978).

**13.** This course has been pursued often by the Fifth Circuit and has been enthusiastically endorsed by the Supreme Court. *See, e.g., Lehman v. Schein,* 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974) (especially n. 6); *Exxon Co., U.S.A., a Div. of Exxon Corp. v. Banque de Paris et des Pays–Bas,* 867 F.2d 1524, question certified 874 F.2d 234 (5th Cir.1989); *Manookian v. A.H. Robbins Co., Inc.,* 760 F.2d 567 (5th Cir. 1985); *Boardman v. United Services Auto. Ass'n,* 742 F.2d 847 (5th Cir.1984), answer conformed to, 768 F.2d 718 (5th Cir.1985), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985); *Sandefur v. Cherry,* 718 F.2d 682, *as amended* 721 F.2d 511 (5th Cir.1983), answer conformed to, 744 F.2d 1157 (5th Cir.1984); *Anderson v. Jackson Municipal Airport Authority,* 645 F.2d 401 (5th Cir.1981); *Trail Builders Supply Co. v. Reagan,* 409 F.2d 1059 (5th Cir.1969), answer conformed to, 430 F.2d 828 (5th Cir.1970); *Martinez v. Rodriguez,* 394 F.2d 156 (5th Cir.1968), answer conformed to, 410 F.2d 729 (5th Cir. 1969).

**14.** *See* Mississippi Supreme Court Rules, Rule 46.

questions to be certified.[15] This is to be done under the direction of the Clerk of this Court.

### The "Long" and "Short" of It

The Pucketts cannot prevail on their common law or federal fraud claims. Dr. Puckett's own testimony removes any disputed fact issues in that regard. In the circumstances reflected in this record, RB & H was not required to determine the Pucketts' suitability.

Finding ourselves unable to determine how the Mississippi Supreme Court would resolve the state law questions at issue here, we certify those questions.

AFFIRMED IN PART AND QUESTIONS CERTIFIED.

---

**15.** *See, e.g., West v. Caterpillar Tractor Co.,* 504 F.2d 967 (5th Cir.1974); *In re McClintock,* 558 F.2d 732 (5th Cir.1977); *Pollack v. Govan Construction Co.,* 541 F.2d 1119, 1123 n. 16 (5th Cir.1976) and the cases cited therein; *Allen v. The Estate of Carman,* 446 F.2d 1276 (5th Cir. 1971).

As always, the phrasing of the questions will not restrict the Supreme Court of Mississippi to the exact words used. That court is free to restate the questions to assure answers to the real questions it perceives. *Boardman,* 742 F.2d at 851 n. 10, *quoting, Martinez v. Rodriguez,* 394 F.2d 156 n. 6 (5th Cir.1968):

[T]he particular phrasing used in the certified question is not to restrict the Supreme Court's consideration of the problems involved and the issues as the Supreme Court perceives them to be in its analysis of the record certified in this case. This latitude extends to the Supreme Court's restatement of the issue or issues in the matter in which the answers are to be given, whether as a comprehensive whole or in subordinate or even contingent parts.