Florence M. NUTTALL, Executrix of the Estate of Clarence O. Nuttal, Deceased, Appellant,

v.

READING COMPANY.

No. 11773.

United States Court of Appeals Third Circuit.

Argued May 8, 1956.

Decided July 5, 1956.

Rehearing Denied Sept. 7, 1956.

Joseph S. Lord, 3d, Philadelphia, Pa.,
B. Nathaniel Richter, Philadelphia, Pa.
(Richter, Lord, Farage & Levy, Philadelphia, Pa., on the brief), for appellant.

John R. McConnell, Philadelphia, Pa. (Morgan, Lewis & Bockius, Philadelphia, Pa., on the brief), for appellee.

Before GOODRICH, KALODNER and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

This is an appeal from a judgment for the defendant in a suit brought by the plaintiff as Executrix of the estate of her deceased husband. Claims are made both under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 and the Boiler Inspection Act, 45 U.S.C.A. § 23.

The case was tried twice. At the first trial plaintiff recovered a verdict of $30,-000. The district court, however, ordered a new trial. At this trial the court directed a verdict on the F.E.L.A. claim and the jury found against the plaintiff on the claim made under the Boiler Inspection Act. The plaintiff would have us restore the verdict originally rendered in her favor. If unsuccessful in this demand she asks for a new trial because of alleged mistakes in the course of the one which she lost.

We shall not restore the first verdict. The trial judge had three points in mind when he set it aside and ordered a new trial. One had to do with the question whether there could be recovery on behalf of a minor child who lived with the plaintiff and her husband and who, it was claimed, was supported by them. The claim of the child dropped out before the case was submitted to the jury but conceivably there could have been an atmosphere of sympathetic emotion engendered by the introduction of the child's needs into the case.

There was also a question of surprise in the claim made under the Boiler Inspection Act. It is true that such a claim was mentioned in the original pleadings. But the court and defendant's counsel were assured that the plaintiff's reliance was on the Federal Employers' Liability Act. It was only after testimony developed during the trial that plaintiff's counsel determined to press a claim for liability based on that statute.

A third ground was the trial court's belief that he had mistakenly admitted testimony which, on further consideration, he believed to be inadmissible. The problem presented by this testimony will constitute the main part of this opinion and will be postponed until later.

■■■ The authority of the trial judge to grant a new trial is expressly recognized by rule 59, Fed.R.Civ.P., 28 U.S. C.A., which in turn refers back to "any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States * * *." 6 Moore, Federal Practice ¶ 59.05[5], p. 3759 (2d ed. 1953), discussing rule 59 says: "As the motion for new trial is addressed to the sound discretion of the trial court, its grant or denial of the motion is not normally subject to reversal in an appellate court * * *." See, to the same effect, 3 Barron & Holtzoff,. Federal Practice and Procedure § 1302 (Rules ed. 1950). If any one of the three grounds which the learned trial judge had in mind is sufficient to justify his order for a new trial, the order must stand. There was adequate support for the exercise of his discretion in this case.

■■■ We turn, then, to the problems presented at the second trial. So far as the claim based on the Boiler Inspection Act is concerned the jury's verdict settles that unfavorably to the plaintiff and we shall not disturb the verdict. The appellant makes complaint about the judge's charge not adequately covering the peril to "health" as well as "life or limb" in discussing the basis of recovery against a defendant. But the plaintiff's complaint here is not borne out by the record. We think the jury had the claim based upon alleged violation of the duty imposed by this statute correctly put to it and its verdict settles the matter.

We turn, then, to the question which is the heart of the case. That is the question of evidence sought to be introduced by the plaintiff of a telephone call made by her husband on the day in which it is alleged that his fatal exposure to inclement weather took place. Likewise, we must face the admissibility of certain

statements put in writing by employees of the defendant. These items were excluded by the trial judge on the second trial and the result of the exclusion was to denude the plaintiff's case of proof of liability.

█ If the plaintiff in this case can prove that management forced a sick employee, of whose illness they knew or should have known, into work for which he was unfitted because of his condition, a case is made out for the jury under the Federal Employers' Liability Act. As to this general proposition we think there is no dispute.[1]

There are two pieces of evidence which the plaintiff sought to introduce as part of such a case. One had to do with statements made by two employees in the yard where Nuttall reported for duty on the day in question. Since these proffers of testimony are, along with the conversations to be discussed later, the heart of this appeal we set them out verbatim.

"Statement relative to personal injury sustained by Clarence O. Nuttall at Wilmington, Del. on January 5, 1952.

"I am John O'Hara reside at 234 N. Franklin St., Wilmington, Del. Employed by Reading Co. as Fireman & am a qualified Engineman. On 1/5/52 I was Fireman on the 7:00 A. M. Wilmington Yard Shifter, had OE50. Clarence Nuttall was Engineman.

"When I reported for duty 7:00 AM 1/5/52 & checked engine, etc. I noticed Nuttall did not look well. I asked him what was the matter. He just said he wasn't feeling too good. He was coughing and couldn't seem to get his breath. Nuttall told me that he had called the yard office about 6:00 am and asked to be relieved and he was told that he couldn't be as there were no men available to take his place. Nuttall operated engine for approximately an hour then as he did not seem at all well I asked him to allow me to run & he agreed. He then stayed on Fireman's side for rest of tour of duty. He sort of propped himself on the Fireman's seat but he kept perspiring & coughing. He seemed to have trouble getting his breath after a coughing spell & seemed weak. I suggested to him that he ought to go home but he refused saying the yardmaster told him there was no one available for his relief. He continued on the job but his condition got worse. Approximately 1 pm he went to yard office & reported off until further notice. When he got off engine at end of tour of duty he was very weak & I offered to take him home. I helped him over to his auto but he refused to let me drive him home. He got in his auto & drove away himself.

"I worked with Engineman Nuttall for several days prior to Jan. 5, 1952 & he seemed well except that on Jan. 4, 1952 he seemed to have a slight cold.

"/s/ John P. O'Hara"

"Statement relative to personal injury sustained by Clarence O. Nuttall, at Wilmington, Del., on January 5, 1952.

"I am James Snyder, reside at 7 Winston Ave., Richardson Park, Del. Employed by Reading Co. as Conductor & on 1/5/52 was Conductor on 7 am Wilmington Yard Job. Clarence Nuttall was our Engineman.

"When we started work at 7 am Engineman Nuttall complained of feeling bad. He had a cold. Sometime during the morning Fireman O'Hara started operating engine as Nuttall was not feeling well. I had occasion to get on the engine & I saw

1. See Bascho v. Pennsylvania R. Co., 1949, 3 N.J.Super. 86, 92, 65 A.2d 613, 616; Gulf, Colorado & Santa Fe Ry. Co. v. Waterhouse, Tex.Civ.App.1949, 223 S.W. 2d 654, 660. See also, Blair v. Baltimore & O. R. Co., 1945, 323 U.S. 600, 65 S.Ct. 545, 89 L.Ed. 490; Stewart v. Baltimore & O. R. Co., 2 Cir., 1943, 137 F.2d 527, 528.

Nuttall was looking pretty ill. He seemed choked up & his lips were blue. He said he had tried to get relieved but was unable to. He finished the day's work I did not see him leaving work but I know by that time he was a pretty sick man.

"I worked with Engineman Nuttall on 1/4/52 and he had a bad cold on that day. The only day he tried to get relieved, that he told me about was 1/5/52.

"/s/ James M. Snyder"

The plaintiff says that these statements should be admitted because they tend to show that Nuttall was forced to go to work when he was unfit to do so. It is argued that they may be admitted in evidence under the Federal Business Records Act, 28 U.S.C.A. § 1732, as reports made in the regular course of business.

■ It is to be noted, however, that these statements were secured from these employees after Mrs. Nuttall had filed suit against the company and were secured as part of the investigation made by railroad officials in getting ready for trial. That being so, we do not see how there is any way in which these statements can be received into evidence under the Supreme Court's decision in Palmer v. Hoffman, 1943, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645. That case is on all fours upon this point and it goes without saying that we are bound to follow it until it is modified or overruled.[2]

■ It is contended that these statements are admissible because "adopted" by the defendant.[3] We do not see the thrust of this argument. The statements were secured by defendant's investigating officer who put them in his file. We do not see how there can be worked out any plausible theory about their adoption by the defendant as anything more than a report received by the employees as a routine part of investigating accidents or illnesses.

■ Plaintiff argues that the railroad authorized its employees to give these statements and this makes them admissible against the defendant as a vicarious admission. We disagree with plaintiff's legal proposition. The reports were made by agents to their principal or to fellow agents and not to a third party on behalf of the principal. A third party then is in no position to argue that the employees were representing or speaking for the railroad when they made the statements. This appears to be the approach taken by the Pennsylvania courts[4] and by most authorities.[5]

■ Finally, on this point, it is argued for the plaintiff that the employee Snyder's statement should be admitted as a declaration against interest. The theory is that Snyder was Nuttall's boss and that Snyder's permitting Nuttall to work when he was not fit to do so was something for which Snyder could be held responsible either by discipline or tort liability. We think that this argument presses the doctrine of declaration against interest much too far. Morgan states the rule [Basic Problems of Evidence, vol. 2, page 253 (1954)]: "'* * * the fact must be so palpably against the declarant's interest that he must have realized it to be so when he made the statement." It is also required that the fact must be "to declarant's immediate prejudice." 2 Morgan, Basic Problems of Evidence 252 (1954). Neither one of these requirements of the seven laid down for admissibility seems

2. The interpretation which has been given to the Pennsylvania Uniform Business Records as Evidence Act, 28 P.S.Pa. §§ 91a–d, has been at least as restrictive as that given to the federal statute. Evergreen Broom Mfg. Co. v. Pennsylvania R. Co., 1954, 378 Pa. 60, 67, 105 A.2d 88, 91.

3. See, generally, 2 Morgan, Basic Problems of Evidence 233 (1954).

4. Brown, Pennsylvania Evidence 139 (1949).

5. 2 Morgan, Basic Problems of Evidence 236 (1954); Restatement, Agency § 287 (1933); United States v. United Shoe Machinery Corp., D.C.D.Mass.1950, 89 F. Supp. 349, 352 (excellent discussion by Judge Wyzanski); contra McCormick, Evidence § 78 (1954).

to us to be fulfilled here. The Snyder statement is not, therefore, to be admitted as a declaration against interest.

Now we turn to the other vital piece of testimony. On the morning of January 5, 1952, Nuttall had a telephone conversation from his home with the yardmaster at Wilmington. This conversation took place in the presence of his wife and at the end there was an additional statement made to her after he had hung up the receiver. Here is the conversation which plaintiff offered and the district judge refused (We quote from Mrs. Nuttall's testimony at the first trial.):

"Q. Suppose you start again. He got on the phone and he dialed the office and he said something to George.

"A. Yes. He said, 'George, he said, I am very sick, I don't think I will be able to come to work today.'

"Q. What was the next you heard your husband say?

"A. I heard him say, 'But I can't come to work today, I don't feel I can make it.'

"Q. What was the next think you heard your husband say?

"A. I heard him say, 'but, George, why are you forcing me to come to work the way I feel?

"Q. Then did your husband say anything after that?

"A. Well, he said, 'I guess I will have to come out then.'

"Q. Was that the end of this conversation on the telephone?

"A. It was.

"Q. Then what did he do with the telephone?

"A. He put the telephone back.

"Q. Then did you help him? Then what happened? Did he go off, or go to work, or did he remain in the house, or what?

"A. No, he went to work, he said to me, 'I guess I will have to go.'"

There are two theories on which one can urge and test the admissibility of this conversation. One is that the fact that it took place is circumstantial evidence of the alleged fact that Nuttall thought he was being forced to go to work, did not want to go, and when he did go, yielded to the pressure which he believed was being exerted. Words people use can prove things other than the things which they say. For instance, if a man goes around saying that he is Napoleon Bonaparte, evidence of that fact is clearly circumstantial evidence to prove, not only his state of mind, but the state of his mind if the state of his mind is relevant in any litigation. So here the fact of a conversation in which the speaker was protesting and at the end of which he looked angry and clenched his fists is circumstantial evidence to prove that what he did thereafter was in submission to the force which he thought had been exerted. All of this is not an exception to the hearsay rule at all because on this aspect we are dealing with the conversation simply as circumstantial evidence showing what was in a man's mind, not the truth of what he said. The hearsay principle is not involved unless there is a direct assertion about his state of mind.[6]

█ In this instance, however, it matters not whether the evidence was hearsay. One of the exceptions to the rule excluding hearsay is that a man's declarations as to his state of mind may be used to establish that state of mind and, to some degree, such other things as proof of a state of mind tends to establish.[7] For instance, if a man tells his secretary, "I am starting for New York," that conversation is admissible as tending to prove presence in New York on the given day. So, here, Nuttall's statements to his boss and Nuttall's statement to his wife at the conclusion of the conversation on the telephone tend to prove that he thought he was being forced to do something he did not want to do and that he submitted to the compulsion which he be-

---

6. 2 Morgan, Basic Problems of Evidence 218 (1954).

7. 2 Morgan, Basic Problem of Evidence 289, 291 (1954).

lieved to exist. It is true that there can be no cross-examination of Nuttall for the poor man is dead. There is the possibility for cross-examination of Mrs. Nuttall, the plaintiff, as to what her husband said on that morning.

 The account of the telephone conversation and the statement of Nuttall which followed it are admissible on either of the theories discussed above.

There was also testimony from a witness named John P. O'Hara which was excluded at the second trial. O'Hara was a fellow workman with Nuttall. At the first trial he testified to remarks made by Nuttall to him on the day in question. He said that Nuttall had stated that he was not feeling well, that he had requested to be off that day but was refused permission. This testimony was excluded at the second trial. We think that the testimony was admissible for the same reasons as those given in discussing the admissibility of the account of the telephone conversation. 2 Morgan, Basic Problems of Evidence 218, 294 (1954).

Such testimony is objected to because it is alleged to be "self-serving." Fortunately this matter has received discussion in a first-rate book on Evidence recently published. See McCormick, Evidence page 588 (1954):

> "The doctrine that a party's out-of-court declarations or statements cannot be evidence in his favor, because 'self-serving,' seems to have originated as a counter-part and accompaniment of the rule, now universally discarded, forbidding parties to testify. When this latter rule of disqualification for interest was abrogated by statute, the accompanying rule against 'self-serving' declarations should have been regarded as abolished by implication. Unfortunately it has lingered in the language of many opinions as a sweeping rule of exclusion."

McCormick also talks about the application of the opinion rule to out-of-court statements. (See page 38). He points out that in the view to which the courts are now tending, namely, "that the opinion rule is not an absolute rule of exclusion, but rather a relative rule for the examination of witnesses . . . it becomes obvious that it has no sensible application to statements made out of court." See the application of this point of view to a dying declaration by Mr. Justice Jones in Commonwealth v. Plubell, 1951, 367 Pa. 452, 457, 80 A.2d 825, 828.

To hold the defendant responsible for sending a sick man into unsuitable work it must be shown that the man was not only under pressure but was under pressure to undertake the work by virtue of something the employer had done. The persecution complex is a well known psychiatric phenomenon; it would be highly unfair to hold an employer responsible for something the employee merely imagined without the employer inducing it.

Is the telephone conversation evidence of pressure by the employer? Unfortunately, both parties to the conversation are dead. Neither can minimize, enlarge, explain, or otherwise make any commentary upon the words Mrs. Nuttall heard her husband use on that morning of January 5th.

We think that the conversation tends to show that Nuttall was being forced to do something by somebody. The "somebody" is identified without difficulty. He was Marquette the railroad employee in charge of operations in the yard. Knowing that Nuttall's superior was talking to him on the telephone we think that the words Nuttall used during the time and his statement immediately afterward tend to show that he was being forced to go to work. At this point we are assuming Nuttall's state of mind established and seeking probative evidence that his state of mind was induced by something his employer did. When a man talks as Nuttall did and acts as Nuttall did during and immediately following a conversation on the telephone with his boss, it has a tendency to show that the boss was requiring him to come to work against his will.

What Nuttall had to say during the telephone conversation was subject to Marquette's comment and response. In his statement to his wife following the conversation Nuttall merely reiterated what he had already said and in terms less accusatory. Mrs. Nuttall has no personal knowledge of what Marquette said and neither does anyone else for both parties to the conversation are dead. She did hear her husband characterize the statements of his boss at the very moment he heard what Marquette had to say and immediately thereafter.[8] Such characterizations, since made substantially at the time the event they described was perceived, are free from the possibility of lapse of memory on the part of the declarant. And this contemporaneousness lessens the likelihood of conscious misrepresentation.[9] All things considered, we think that Nuttall's statements during and immediately following the telephone conversation should be admitted into evidence to prove that he was being compelled to come to work.

This conclusion seems consistent with the results reached in several Pennsylvania cases [10] which, however, describe it in terms of the res gestae, a classification we are trying to avoid because of its vagueness.[11]

None of this discussion is intended to apply to the statement Nuttall is alleged to have made to O'Hara in the yard later in the day.

Mistakes on admissibility of evidence are almost inevitable during a hotly contested trial. Unless they seriously affect the case they are not a ground for reversal. But here the rejected evidence goes to the very heart of the plaintiff's case. It is unfortunate that this type of case must be tried three times. But that is necessary in this instance.

The judgment of the district court will be reversed and the case remanded with further proceedings not inconsistent with this opinion.

---

8. " * * * [A] *bystander*, listening to A's conversation with B at the telephone, is qualified to report A's utterances heard by him, but in strictness is not qualified to report B's utterances as repeated or alluded to by A during the conversation. Nevertheless, the strict application of the requirement of personal knowledge is here out of place, and leads to unpractical quibbles." 2 Wigmore, Evidence § 669, p. 790 (3d ed. 1940).

9. The peculiar characteristics of the contemporaneous statement have led distinguished authorities to declare for its admissibility. 2 Morgan, Basic Problems of Evidence 296 (1954); McCormick, Evidence § 273 (1954).

10. See Brown, Pennsylvania Evidence 168–170 (1949). See also 1 Henry, Pennsylvania Evidence § 466 (4th ed. 1953).

11. See 2 Morgan, Basic Problems of Evidence 284 (1954).