871 F.2d 672
 27 Fed. R. Evid. Serv. 1199
 James C. MAYOZA, M.D., an individual and Trustee of the
James C. Mayoza, M.D., Inc. Defined Pension Plan Trust, an
Oklahoma trust, and the James C. Mayoza, M.D., Inc., Pension
Fund Rollover Trust, an Oklahoma trust, Plaintiffs-Appellants,
v.
HEINOLD COMMODITIES, INC., a Delaware corporation, Defendant-Appellee.
 No. 88-1432.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 10, 1988.
Decided March 29, 1989.
 
 J. Stephen Welch, Albright & Welch, P.C., Tulsa, Okl., for plaintiffs-appellants.
 Michael Elman, Chicago, Ill., for defendant-appellee.
 Before COFFEY, RIPPLE and KANNE, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 The plaintiff-appellant, Dr. James Mayoza, an investor in commodity futures, lost a substantial sum of money with the collapse of the silver futures market in late February of 1982. Subsequently, he filed suit in his own name and as trustee of two pension trust funds against Heinold Commodities, Inc. and two of its brokers, Leo and James Croley, alleging breach of contract and violation of the Commodity Exchange Act (7 U.S.C. Sec. 1 et seq.). After trial, the jury returned a verdict in favor of the defendants. Dr. Mayoza appeals, challenging a number of evidentiary rulings. Upon appeal, the appellant executed a release with the brokers Leo and James Croley, leaving Heinold Commodities as the only defendant.
 
 FACTUAL BACKGROUND
 
 2
 In early December 1982, Dr. Mayoza received an invitation to attend an investment seminar from Leo Croley, manager of Heinold's Tulsa, Oklahoma, branch office. On December 20, 1982, after a series of meetings with Leo Croley, Mayoza opened a non-discretionary commodity futures trading account in his own name with an initial investment of $47,500. Prior thereto, Mayoza received and signed Heinold's customer agreement and risk disclosure statement,[1] and on February 16, 1983, he opened two additional commodity trading accounts with Heinold. One account was opened in the name of James C. Mayoza, M.D., Inc. Defined Pension Plan Trust and the other account was identified as the James C. Mayoza, M.D., Inc. Pension Fund Rollover Trust. The initial investment in each of the pension accounts was $35,000 and $65,832, respectively. According to the parties' statement of uncontested facts (which the trial judge read to the jury):
 
 
 3
 "After each trade Heinold sent Dr. Mayoza an account statement detailing all activity which occurred in Dr. Mayoza's account on the previous day.
 
 
 4
 In addition, at the end of each month Heinold sent Dr. Mayoza a statement recapping the trading activity in his account.
 
 
 5
 However, Dr. Mayoza and Dr. Mayoza's employees deny receiving the confirmations supposedly sent to his Tulsa medical office."
 
 
 6
 (Tr. 21).
 
 
 7
 On or about February 28, 1983, the appellant, who then held twelve silver futures contracts in his three Heinold accounts, lost a substantial sum of money when the silver futures market took a dramatic plunge. Mayoza spoke with Leo Croley concerning Mayoza's obligation to meet the margin call resulting from the market decline. Subsequently, Mayoza satisfied the margin call with a deposit of an additional $100,000. Mayoza closed his Heinold accounts in March or April of 1983. On May 2, 1983, Mayoza deposited $15,000 with another commodity broker, Conticommodity Services, Inc., and opened a commodity futures account in his own name.
 
 
 8
 At trial, Mayoza alleged that Leo Croley churned his accounts, conducted unauthorized trades, moved trades between accounts without authorization and transferred losing trades of other customers into his accounts. He also alleged that Croley misrepresented the safety of commodity trading and wrongfully induced him to open commodity accounts. The jury found for the defendants. On appeal, Mayoza contends that the trial judge erred in excluding evidence proffered and in admitting evidence that he engaged in additional commodity trading with Conticommodity Services, Inc. after he closed his Heinold accounts.
 
 I. MRS. MAYOZA'S TESTIMONY
 
 9
 Initially, the plaintiff-appellant challenges the trial judge's refusal to allow Mrs. Mayoza to testify regarding her husband's state of mind and statements to Leo Croley, his principal broker with Heinold Commodities, during his telephone conversation with Croley on February 28, 1983. The appellant attempted to call Mrs. Mayoza as a witness to testify that she was with her husband when he spoke with Croley and that she had observed her husband was extremely upset during and after the phone conversation. Furthermore, she would testify that she overheard her husband tell Croley that he (her husband) had not authorized Croley to purchase the silver contracts.[2] The court excluded the evidence, ruling it hearsay. It is well established that the trial court has broad discretion in assessing the admissibility of evidence in light of the hearsay rules, and we may reverse its rulings on appeal only upon an abuse of discretion standard. United States v. Moore, 791 F.2d 566, 570 (7th Cir.1986) (Fed.R.Evid. 803).
 
 
 10
 The appellant urges that his wife's testimony was admissible on two different theories. First, he claims the evidence is not hearsay under Fed.R.Evid. 801(d)(1)(B). That rule states:
 
 
 11
 "(d) Statements Which are Not Hearsay. A statement is not hearsay if--(1) prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive...."
 
 
 12
 The appellant contends that Mrs. Mayoza's testimony was not hearsay because it was offered to rebut the defendant's allegation that the appellant fabricated his previous testimony that he did not authorize Leo Croley to purchase the silver contracts. In support of his argument he directs our attention to a portion of his cross-examination (Tr. 244-47), wherein defense counsel probed Mayoza's recollection of his February 28, 1983, telephone conversation with Leo Croley. The excerpt relied upon is set forth below:
 
 
 13
 "Q: Now, when you had this conversation with Mr. Croley on Monday morning, February 28th, he told you he had some bad news for you, correct?
 
 
 14
 A: Yes, sir.
 
 
 15
 Q: Said you were locked in and you couldn't get out of your positions?
 
 
 16
 A: Yes, sir.
 
 
 17
 Q: Now, he also said to you that you shouldn't worry, that he'll get your money back for you--
 
 
 18
 A: Yes, sir.
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 Q: At any time during [your] deposition did you ever testify that Leo Croley told you during this conversation not to worry, I'll get your money back?
 
 
 22
 A: As best I recall and everything, he told me not to worry, that other people were panicking and everything and this was just a technical correction and it was going to turn around and come back.
 
 
 23
 Q: But he never told you that he'd get your money back for you, did he?
 
 
 24
 A: Yea, he said to me that: Listen--as best I recall and everything--there's money to be made.
 
 
 25
 * * *
 
 
 26
 * * *
 
 
 27
 Q: ... During your deposition when we were talking about this conversation at no time did you ever state in that deposition that Leo Croley told you this was a quote, unquote, technical correction; isn't that correct? Never said that in your deposition?
 
 
 28
 A: I don't recollect, sir.
 
 
 29
 Q: When did you give your deposition, do you recall?
 
 
 30
 A: It was in '86. It seems like it was in April.
 
 
 31
 Q: And these events occurred in 1983; is that right?
 
 
 32
 A: Yes, sir.
 
 
 33
 Q: Is your recollection better today in 1988 about a conversation in 1983 than it was in 1986?
 
 
 34
 A: I wouldn't say that. I mean--
 
 
 35
 * * *
 
 
 36
 * * *
 
 
 37
 Q: Now, when Leo Croley told you that this was a technical correction, did you call John Highfill and ask him if he agreed with Leo Croley's prediction?
 
 
 38
 A: I don't remember the specifics. What I talked about to Mr. Highfill--"
 
 
 39
 (Tr. 244-47). The excerpt the appellant cites fails to support his contention that defense counsel attempted, either explicitly or implicitly, to demonstrate during cross-examination that Mayoza fabricated his testimony that he did not authorize the silver purchases. Thus, we are convinced that Mrs. Mayoza's testimony, when initially proffered, was not offered to rebut an accusation of fabrication and thus was not admissible under Rule 801(d)(1)(B). Nor was Mrs. Mayoza's testimony offered to rebut Leo Croley's account of the February 28 telephone conversation, as Croley had not yet testified. The appellant never again sought leave to proffer Mrs. Mayoza's testimony even though the district judge stated, when initially excluding the evidence, that he might be receptive to the possibility of admitting it at a later stage in the trial.
 
 
 40
 The appellant also claims the evidence was admissible under Rule 803(3):
 
 
 41
 "The following are not excluded by the hearsay rule, even though the declarant is available as a witness: ... (3) then existing mental, emotional, or physical condition. A statement of the declarant's then-existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed...."
 
 
 42
 (Emphasis added). Mayoza posits that his wife's testimony "was offered to show Mayoza's shock and agitated state upon receipt of the information from Leo Croley that Mayoza held twelve ... positions in silver" (Br. p. 9), and cites Nuttall v. Reading Co., 235 F.2d 546, 551-53 (3d Cir.1956), in support of the proposition.
 
 
 43
 The appellant's reliance on Nuttall is unpersuasive. Clarence Nuttall filed suit under the Federal Employers' Liability Act alleging that Mr. Nuttall's employer, knowing that Mr. Nuttall was ill, compelled him to report for work, and he subsequently suffered fatal exposure to inclement weather. Nuttall's employer contended that it had not forced him to report for work. Mrs. Nuttall was prepared to testify that she was present when her husband had a telephone conversation with his superior, and while complaining of being ill, queried his superior, "Why are you forcing me to come to work the way I feel?" Id. at 551. The critical question in Nuttall was whether Mr. Nuttall reported to work voluntarily or under compulsion. Thus, his state of mind during and after the phone conversation with his superior was relevant.
 
 
 44
 In contrast, in this case the appellant's state of mind during and after his telephone conversation with Leo Croley is not at issue. As the district judge observed, it is undisputed that the conversation shocked and upset Mayoza. After all, he had just received news that he had lost a considerable investment in the silver futures market. The trial judge reasoned, and we agree, that the appellant offered his wife's recollection of his telephone conversation with Leo Croley not to demonstrate his undisputed state of mind at that time, but to prove that he did not authorize purchase of the silver contracts. The trial judge, quoting the highlighted portion of Rule 803(3) above, stated:
 
 
 45
 "The operative fact here is that while in an excited condition, under stress, Dr. Mayoza said on the telephone, according to his testimony and according to the testimony of this witness, I didn't authorize 12 contracts or whatever it was that he said. To me you are dealing directly at that time with a statement of memory or belief to prove the fact remembered or believed. And I think that that is what the evidence is directed to, and for that reason I exclude it."
 
 
 46
 (Tr. 547). We refuse to hold that he abused his discretion in so finding. Mrs. Mayoza's memory of her husband's statement to Croley does nothing to establish the appellant's "shocked and agitated state" during the phone conversation. The trial judge was entitled to find that the testimony was offered for an impermissible purpose, i.e., to reinforce the appellant's testimony that he did not authorize the silver purchases.
 
 II. MAYOZA'S HEART CONDITION
 
 47
 In his complaint and during his deposition, Mayoza claimed that he told Leo Croley during their initial meeting that he was suffering from a heart condition and therefore his investments must be conservative in nature. Prior to trial, the defendants filed a motion in limine requesting that the court preclude Mayoza from testifying about his heart condition on the ground that it was irrelevant to any issue in the case and would do nothing but attempt to provoke sympathy from the jury. In granting the motion, the trial judge expressed his agreement with the traditional principle in fraud cases that the circumstances and characteristics of a particular investor are generally admissible to show whether the investor reasonably relied on a broker's representations. However, the court concluded that the evidence offered concerning Mayoza's heart condition was not probative of the question of fraud and would both confuse and unnecessarily lengthen the trial. He explained:
 
 
 48
 "Presumably plaintiff's point is that a person with a bad heart would not enter into a risky investment because of losses incurred, he might have a heart attack. Therefore, the theory goes Croley must have assured Mayoza that Croley's method of trading was safe; otherwise, Mayoza would not have invested. The difficulty with introducing the evidence is it would necessitate producing evidence on a wholly collateral issue, and that is the relationship of a heart condition to risky investments.... I just don't think that the relationship of risky investment and heart attacks is such common knowledge that it would influence--reasonably influence an investment counselor to adopt one strategy or another.... For this reason I think that the evidence is of little or no probative value, and whatever value it has is greatly outweighed by the fact that it would needlessly add to the length of this trial. If admitted, it would confuse the issues and it might at least to some degree unfairly prejudice the defendants."
 
 
 49
 (Pretrial Motion Tr. 10-12).
 
 
 50
 We have repeatedly held that "[t]he trial judge's assessment of relative probative value and unfair prejudice is generally accorded great deference because of his first-hand exposure to the evidence and his familiarity with the course of the trial proceeding." U.S. v. Liefer, 778 F.2d 1236, 1244 (7th Cir.1985). We may reverse the trial judge's rulings on these matters only if he abused his discretion. Rodriguez v. Schweiger, 796 F.2d 930, 935 (7th Cir.1986).
 
 
 51
 The appellant argues that the court's analysis "misses the point." He says that he did not offer the evidence to demonstrate that he sought a safe investment because he was fearful of a heart attack, but rather he intended to establish that "he could no longer work the hours necessary to accumulate the money invested, especially the retirement funds." (Mayoza Brief at p. 14). Apparently, the appellant alleges that his medical practice would have to be limited in the future and therefore so would his income because his heart condition required him to reduce his workload, which in turn prompted him to insist that the funds he had set aside for investment and retirement be deposited in a relatively risk-free market. While this argument, as best as we can understand it, may have some merit, the appellant failed to present it to the trial judge in a cohesive, understandable manner. Further, the argument is less than clear on appeal. We reject the contention that the trial judge "missed the point," and thus abused his discretion in excluding evidence of Mayoza's heart condition, in failing to address an argument presented, at best, in vague, ambiguous language.
 
 
 52
 Regardless of the precise relevance of the appellant's physical condition, the appellant's thrust is that his fragile heart condition, as allegedly communicated to his broker, Leo Croley, "clearly indicate[s] Mayoza's intent to limit his risk and further demonstrates the degree of reliance Mayoza placed on the representations of Leo Croley." (Mayoza Brief at p. 13). However, the trial judge specifically noted that Mayoza was entitled to testify that he told Mr. Croley that he sought a safe investment and that his trading objectives were conservative. We agree with the trial judge that the appellant was not entitled to bolster that testimony by stating that he told Mr. Croley of his heart condition. The appellant has failed to provide a cogent explanation for or case law in support of his contention that his physical (heart) condition "demonstrates the degree of reliance" he placed on Mr. Croley. On the other hand, the evidence might very well have provoked sympathy from the jury, thus necessitating more time-consuming corroborative proof that the heart condition in fact existed. The trial judge was well within his discretion in excluding the evidence under Fed.R.Evid. 403 on the grounds that it "would needlessly add to the length of [the] trial" and "would confuse the issues." (Pretrial Mo. Tr. 12). See, e.g., McCluney v. Joseph Schlitz Brewing Co., 728 F.2d 924, 928-29 (7th Cir.1984) (excluding on waste of time grounds) ("An appellate court is hardly in a position to reevaluate, based on a cold record, the helpfulness of certain testimony or the subtle balancing of factors contained in Rule 403"); Pucalik v. Holiday Inns, Inc., 777 F.2d 359, 363 (7th Cir.1985) (excluding due to confusion of issues).[3]
 
 
 53
 III. TRADING RESULTS OF CROLEY'S OTHER CUSTOMERS
 
 
 54
 The trial judge also granted the defendants' pretrial motion in limine excluding evidence that some of Heinold's other customers had lost money on commodity accounts handled by Leo Croley. It was the appellant's contention at trial, and also on appeal, that trading losses in Croley's other accounts produced debit balances for which Croley was personally responsible, thereby establishing a motive for Croley to churn Mayoza's accounts and transfer losing commodity contracts to them in order to eliminate the debt. The court ruled that the appellant's theory was plausible and that Mayoza was entitled to prove it "if, but only if, he has some specific evidence." The court continued:
 
 
 55
 "We agree with defendants that plaintiff cannot simply claim that in general Croley had other customers who lost money and therefore he must have transferred some of their trades to plaintiff's accounts. Without more specificity the minimal probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendants."
 
 
 56
 (Pretrial Motion Tr. 15).
 
 
 57
 The appellant has failed to set forth much less point to any specific evidence in the record of excessive trading in his accounts. Furthermore, he has also failed to cite any particular losing contracts transferred to his accounts or evidence of any specific account, customer or trade which gave rise to an overall debit balance among Croley's other customers. We agree with the trial judge's conclusion that the appellant's theory was too vague, speculative and unsubstantiated to warrant presentation to the jury and that its probative value was substantially outweighed by its potential of confusing the jury and thus prejudicing the defendants with an inference that Mr. Croley was an incompetent broker. We also hold that the theory was much too speculative to qualify for admission to prove motive, plan or absence of mistake under Rule 404(b).
 
 IV. BROKER NEGLIGENCE
 
 58
 Herbert Sheidy, the appellant's expert witness, testified during his deposition that Leo Croley could have limited the appellant's losses on silver contracts with the purchase of additional silver contracts in February 1983. The defendants filed a motion in limine to preclude testimony by Mr. Sheidy at trial that the defendants failed to advise the appellant of that trading strategy. The defendants argued that the failure to disclose the strategy was, at best, negligent, and the appellant failed in his pleadings to include a negligence claim. The defendants further argued that mere negligence is not a violation of the Commodities Exchange Act.[4] The court granted the motion because the failure to advise the appellant of the strategy, without more, did not "rise[ ] to the level of recklessness or even gross negligence," and therefore was not encompassed within the parameters of the Commodities Exchange Act.
 
 
 59
 The appellant concedes that mere negligence is not actionable under the Act. He submits, however, that Croley's failure to disclose the trading strategy identified by Mr. Sheidy amounted to recklessness, either standing alone or when considered in conjunction with other evidence. We are not in agreement with the appellant's theory. A commodity broker's conduct is "reckless" for purposes of the Commodities Exchange Act only if the broker acts "in disregard of a risk so obvious" that the broker "must be taken to have been aware of it, and [the risk is] so great as to make it highly probable that harm would follow." First Commod. Corp. v. Commodity Futures Trading Comm'n, 676 F.2d 1, 7 (1st Cir.1982). Mr. Sheidy did not testify that the purchase of additional silver contracts was appropriate in the circumstances Mr. Croley was confronted with, nor did he state that the strategy was routinely adopted in similar situations. His testimony was, in fact, equivocal, as he prefaced his comments with the statement that he was "not making any judgments at this point on it because I don't know the factors that were then operative in the marketplace at this point, including things like volume...." This undeveloped, indefinite testimony, either alone or in combination with other evidence, falls short of establishing intentional or reckless misconduct. We agree with the district judge that "Without more, this evidence may only be characterized as negligence, which is not actionable under the Commodities Exchange Act." (Pretrial Motion Tr. 16). We conclude that the above rationale is a proper basis for excluding Mr. Sheidy's testimony regarding a particular undisclosed trading strategy, and therefore hold that its exclusion did not constitute an abuse of discretion.
 
 V. SUBSEQUENT TRADING
 
 60
 Mayoza opened a commodity futures trading account with Conticommodity Services, Inc., another commodity broker, on May 2, 1983, two months after suffering the commodity losses at issue in this case. The appellant filed a pretrial motion in limine to preclude Heinold from introducing that evidence on the ground that it was irrelevant and could have the prejudicial effect of portraying Mayoza as a sophisticated investor. The district judge initially granted the motion, ruling that the evidence, though it had some probative value, presented a substantial risk of juror confusion and prejudice to the appellant. However, the court warned the appellant that the motion was subject to reconsideration at the defendants' request depending upon the nature of the proof presented and that "it won't take very much to open the door to admission of this evidence." The defendants contended that the door was indeed opened by Mayoza in the following exchange during his direct examination:
 
 
 61
 "Q: Dr. Mayoza, if it had been explained to you in your initial meetings with Mr. Croley that the market could get in a position and you could not get out or that you might have to bring in more money, would you have still made the investments?
 
 
 62
 A: No, sir. Never."
 
 
 63
 (Tr. 129).
 
 
 64
 The defendants argued to the trial judge that the above testimony--to the effect that, knowing the risks of commodity trading, the appellant would not have entered the market--was impeached by his decision to open an account with Conticommodity after he had sustained considerable losses in silver futures. The court dismissed the jury and allowed the defendants to make an offer of proof. The following day, while Mayoza was again subject to cross-examination and after reviewing the offer of proof, the court reversed its pretrial ruling and admitted the evidence of the second entry into the highly volatile commodity market.
 
 
 65
 The appellant urges that the evidence had little or no probative value because the Conticommodity account was opened on behalf of Mayoza personally rather than on behalf of his pension funds, and the subsequent trading involved a relatively small investment ($15,000 to $20,000, as compared with $100,000 invested with the defendants). We are not persuaded that these distinctions undermine the relevance of the evidence. Mayoza testified that he approached Heinold in December 1982 as an unsophisticated investor seeking a safe haven for his personal and pension capital. He also claimed to have advised Leo Croley, his Heinold broker, that he had little investment capital that he could afford to lose. He alleged that the defendants misled him into believing that investment in commodity futures was consistent with his safe and conservative investment objectives, and that Heinold and its brokers failed to advise him that he could lose more than his initial investment or that he could possibly be "locked in" to a losing position. He then suffered a substantial commodity loss and was forced to meet a margin call by investing an additional $100,000.
 
 
 66
 According to the appellant, it was only after he witnessed the collapse of the silver market and was forced to meet the margin call that he really understood the risks of commodity trading. He testified that if he knew of the dangers from the outset, he would not have invested as he did. It is relevant and probative that the defendants be allowed to demonstrate that just two months after Mayoza lost over $200,000 in the commodity market with Heinold, he (Mayoza) decided on his own initiative to take the very same speculative plunge and once again enter the commodity market through Conticommodity Services, Inc. The nature of this evidence goes to the question of his credibility after he testified that he was an unsophisticated investor disinclined to risk. It suggests that Mayoza was in fact a risk taker, willing to jump into the volatile commodity market--fully aware of the potential for catastrophe--in order to recoup his losses. We do not agree with the ridiculous argument that the probative value of the evidence is diminished because the monetary value of the investment with Conticommodities was less than his investment with Heinold, or because the funds invested were personal: $15,000 to $20,000 is a substantial sum of money to place in a highly speculative venture for an avowedly conservative investor with little available risk capital. The record reflects that the trial judge admitted the evidence only after carefully weighing its probative value against its prejudicial effect, based on his familiarity with the proceedings, and only after warning the appellant that the door to its admission might very easily be opened. We find no error.
 
 The verdict of the jury is
 
 67
 AFFIRMED.
 
 
 
 [1]
 Paragraph 1 of the customer agreement stated:
 "Customer acknowledges that investments in commodity futures contract is speculative, involves a high degree of risk and is suitable only for persons who can assume risk of loss in excess of their margin deposits. Customer understands that because of the low margin normally required in commodity futures trading, price changes in commodity futures contracts may result in significant customer losses, which losses may substantially exceed customer's investment and margin deposit. Customer also acknowledges that he has received, has read and understands the risk disclosure statement relating to trading in commodity futures contracts."
 (Tr. 150). The risk disclosure statement warned that
 "The risk of loss in trading commodity futures contracts can be substantial. You should therefore carefully consider whether such trading is suitable for you in light of your financial condition. In considering whether to trade you should be aware [that] 1. you may sustain a total loss of the initial margin funds and any additional funds that you deposit with your broker to establish or maintain a position in the commodity futures market. If the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional margin funds on short notice in order to maintain your position...."
 (Tr. 157-58). While Dr. Mayoza signed the documents, he testified that he failed to read them carefully and relied upon Leo Croley's representations regarding the risks and liabilities of commodity trading.
 
 
 [2]
 It was impossible for Mrs. Mayoza to have overheard Croley's reply to her husband as she was not on an extension phone
 
 
 [3]
 At oral argument the appellant's counsel stated that Mayoza is not arguing that Mr. Croley was obligated under the Commodities Exchange Act to advise him that he was not "suitable" to trade commodities because of his heart condition. Indeed, the Commodity Futures Trading Commission has taken a firm stand against imposing on commodity brokers a duty to determine whether an investor is suitable for commodity trading. Phacelli v. Conticommodity Serv. Inc., Comm.Fut.L.Rep. (CCH) p 23, 250 (1986). We do not view the appellant's contention that the Commodities Exchange Act contemplates the admission of an investor's surrounding circumstances, including a heart condition, as a "suitability argument" because, as noted in Phacelli, an investor's circumstances may be assessed under traditional fraud principles "and wholly apart from notions of 'suitability....' " Id
 
 
 [4]
 The anti-fraud provision of the Commodities Exchange Act makes it unlawful
 "(1) for any member of a contract market ... in connection with any order to make ... any contract of sale of any commodity in interstate commerce ... for or on behalf of any other person ... (A) to cheat or defraud or attempt to cheat or defraud such other person; (B) willfully to make ... any false report or statement thereof ...; (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order...."