COLOR LEASING 3, L.P.,
a Massachusetts Limited
Partnership, Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE COR-
PORATION, as Receiver for Old Stone
Bank, a Federal Savings Bank, Defen-
dant.

C.A. No. 94–0488ML.

United States District Court,
D. Rhode Island.

June 30, 1997.

Stephen A. Rodio, Craig M. Scott, Rodio & Brown, for petitioner.

David A. Cooper, Cooper & Sanchez, for respondent.

## ORDER

LISI, District Judge.

The Findings and Recommendation of United States Magistrate Judge Robert W. Lovegreen filed on **April 23, 1997** in the above-captioned matter is accepted pursuant to Title 28 United States Code § 636(b)(1). Plaintiff's motion for partial summary judgment on its claim for conversion is granted. Defendant's motion for summary judgment on the claims for conversion and intentional interference with contractual relations is denied. Plaintiff's motion to strike is granted.

## REPORT AND RECOMMENDATION

LOVEGREEN, United States Magistrate Judge.

This case of competing security interests comes before the Court on cross-motions for partial summary judgment on plaintiff's claim for conversion. Defendant also moves unilaterally for partial summary judgment on plaintiff's claim for intentional interference with contractual relations.

Plaintiff, Color Leasing 3, L.P. ("Color Leasing"), sold a printing press to Consolidated Graphics Corporation ("Con–Graph"). In return, Con–Graph executed a promissory note and a security agreement in favor of Color Leasing. Prior to this exchange, however, the Old Stone Bank (the "Bank"), a federal savings bank, had already perfected several blanket security interests in Con–Graph's then existing and after-acquired assets as collateral for several large operating loans upon which Con–Graph later defaulted. Following default, the Bank seized various collateral, including the printing press which the Bank later sold to a third party at a private sale. Sometime thereafter the Bank failed and was placed into the receivership of the defendant, the Federal Deposit Insurance Corporation (the "FDIC").[1]

---

1. Originally the Bank was placed into the receivership of the Resolution Trust Corporation (the "RTC"). Subsequently, federal law terminated the RTC, replacing it with the FDIC as the statutory successor-receiver of the Bank. *See* 12 U.S.C. § 1441a(m)(1) (1992 & Supp. I 1996).

In its complaint Color Leasing alleges that the Bank's seizure and sale of the printing press amounted to conversion and an intentional interference with its contractual relationship. The claims are premised on Color Leasing's argument that it properly perfected a purchase money security interest in the printing press. The dispute boils down to a priority skirmish between two secured creditors.

This matter has been referred to me for preliminary review, findings, and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Local Rule of Court 32(c). A hearing was held on March 6, 1997. After weighing the arguments of counsel and the memoranda submitted, in addition to conducting independent research, I recommend that Color Leasing's motion for partial summary judgment on its claim for conversion be granted, and that the FDIC's motion for summary judgment on the claims for conversion and intentional interference with contractual relations be denied.

**BACKGROUND.**

The following facts are not disputed. Sometime in 1980, Color Leasing leased to Con–Graph one Miller printing press. The lease expired on June 30, 1988. Color Leasing executed a bill of sale *dated December 31, 1987* for the printing press with Con–Graph. The bill of sale stated, in pertinent part, that the general partners of Color Leasing, "in consideration of Three Hundred Sixty Thousand ($360,000) Dollars paid by [Con–Graph], ..., the receipt whereof is hereby acknowledged, do hereby grant, sell, transfer, and deliver unto [Con–Graph]" a Miller printing press (serial number 18857). Pl.'s Mem. in Supp. of Mot. for Summ. J., Ex. A. On December 31, 1988, Con–Graph executed a promissory note to Color Leasing for three-hundred sixty thousand dollars ($360,000.00), payable in thirty-six (36) equal, monthly installments, plus interest. *Id.* at Ex. B. That same day, Con–Graph executed a security agreement granting Color Leasing "a continuing security interest in all of [Con–Graph's] accounts receivables [sic], contract rights, chattel paper, security agreements, documents, machinery, equipment, fixtures, general intangibles, goods, instruments, inventory, trademarks, patents, license rights and good will [ ] whether now owned or hereafter acquired...." *Id.* at Ex. C. Neither the promissory note nor the security agreement make specific reference to the printing press. Five days later, on January 5, 1989, Color Leasing filed a financing statement with the Massachusetts Secretary of State reflecting its security interest in the printing press referenced in the bill of sale. *Id.* at Ex. D.

Prior to this set of transactions, the Bank had loaned several million dollars to Con–Graph. The Bank collateralized the loans through a series of security agreements covering Con–Graph's property, equipment, inventory, and accounts, then existing and after-acquired. The Bank perfected its security interests through blanket filings in 1984, 1986, and 1987.

Con–Graph defaulted on its loans from the Bank. On November 14, 1991, the Bank notified Color Leasing along with other interested parties of the Bank's plan to seize and sell certain Con–Graph collateral, including the printing press. By letter dated November 18, 1991, Color Leasing notified the bank of its purported status as a purchase money secured creditor and protested the proposed seizure and sale of the printing press. The bank sold the printing press at a private sale.

Sometime thereafter, the bank failed and was eventually placed into the receivership of the FDIC. In April 1993 Color Leasing filed a Proof of Claim with the receiver to recover its damages from the seizure and sale of the printing press. By letter dated July 18, 1994, the receiver disallowed the claim. On September 14, 1994, Color Leasing filed its two-count complaint alleging conversion and intentional interference with contractual relations. Both parties have moved for partial summary judgment on the claim for conversion; the FDIC has alone moved for partial summary judgment on the claim for intentional interference with contractual relations.

**SUMMARY JUDGMENT.**

Our rules of civil procedure state that a party shall be entitled to summary judgment "if the pleadings, depositions, answers to in-

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Hence, "a party seeking summary judgment [must] make a preliminary showing that no genuine issue of material fact exists. Once the movant has made this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.), *cert. denied*, 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). An issue is "genuine" when a "reasonable jury, drawing favorable inferences, could resolve the fact in the manner urged by the nonmoving party"; a "material" fact is a "contested fact that has the potential to alter the outcome of the suit under the governing law if the controversy over it is resolved satisfactorily to the nonmovant." *Blackie v. State of Maine*, 75 F.3d 716, 721 (1st Cir. 1996).

That opposing parties move simultaneously for summary judgment does not relax this inquiry. *Id.* Barring special circumstances not present here, such as where opposing sides agree to a case stated, this Court "must consider each motion separately, drawing inferences against each movant in turn." *Id.* (citation omitted). While genuine issues of material fact remain within the province of the trier-of-fact, the Court resolves all matters of law. *See id.*

### PRIORITIES.

Massachusetts has its own version of Article 9 of the Uniform Commercial Code (the "Code") governing the law of secured transactions.[2] The Code provides rules regarding the attachment and perfection of a security interest, in addition to rules of priority among competing secured creditors.

A party receives an Article 9 security interest through the process of attachment, the consequence of which is to render the interest enforceable against the debtor or a third party. In this case, valid attachment requires that the prospective secured party (i) enter into a security agreement with the debtor, (ii) the necessary parts of which are in a writing signed by the debtor, (iii) who gives value, and (iv) receives rights in the collateral. Mass. Gen. Laws ch. 106, § 9–203(1). The secured party can then render its security interest effective against other creditors through perfection. Where not excepted, perfection requires that the secured party file a financing statement with the appropriate state or local agency. *Id.* at § 9–302(1). Priority among competing security interests in the same collateral typically rests with the first secured creditor to perfect. *Id.* at § 9–312(5)(a). It is undisputed that the Bank was the first secured party to perfect its security interest in the printing press.

However, the Code confers a special priority upon purchase money secured creditors of non-inventory collateral.[3] A security interest is a "purchase money security interest" to the extent that it is "taken or retained by the seller of the collateral to secure all or part of its price." *Id.* at § 9–107(a). Under this special exception, a "purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days thereafter."[4] *Id.* at § 9–

2. Color Leasing correctly notes that Massachusetts law governs this dispute. The Code provides that "perfection and the effect of perfection or nonperfection of a security interest in collateral are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected." Mass. Gen. Laws ch. 106, § 9–103(b) (1990); R.I. Gen. Laws § 6A–9–103(b) (1992). It is undisputed that such event occurred in Massachusetts.

3. The Miller printing press is a good classified as "equipment" under the Massachusetts Code because it was bought for use primarily in business and does not fit within the definition of inventory, farm product, or consumer good. *See* Mass. Gen. Laws ch. 106, § 9–109(2).

4. Note that, by amendment, as of October 16, 1991, the Massachusetts Code extended the ten day period to twenty days. See Mass. Gen. Laws ch. 106, § 9–312(4) (Supp.1996). Since the time-frame for perfection in this case (January 5,

312(4). The primary purpose behind this special status is to encourage new capital investment in a business enterprise where existing creditors balk. J. White & R. Summers, Uniform Commercial Code § 33–5, at 324 (4th ed.1995). To effectuate this purpose, a perfected purchase money security interest will even take priority over an earlier perfected interest acquired under an after-acquired property clause. Mass. Gen. Laws ch. 106 §§ 9–107 cmt. 1, 9–204 cmt. 1, 9–312 cmt. 3.

Applying the foregoing to the undisputed facts, it is clear that, as the first secured party to perfect, the Bank enjoys a superior interest in the printing press, *unless* it is shown that Color Leasing perfected a purchase money security interest in the same collateral. The survival of the conversion claim hinges upon the answer to this question because, in order to prove the elements of that tort, Color Leasing must demonstrate, inter alia, that the Bank exercised wrongful control over personal property in which Color Leasing held an ownership interest.

### COLOR LEASING'S MOTION.

To overcome the only major hurdle toward summary judgment on its claim for conversion Color Leasing must establish, with the undisputed facts, first, that a purchase money security interest attached in the printing press, and, second, the perfection of such interest. The FDIC contends that genuine issues of material fact obtain in both inquiries, precluding partial summary judgment in favor of Color Leasing.

#### A. Attachment.

We begin with the question of attachment. Color Leasing argues that a purchase money security interest in the printing press attached when it, as seller of the collateral, retained an interest as security for the price of the printing press. To carry its burden, Color Leasing must demonstrate that it entered into a security agreement with Con–Graph, the necessary parts of which were in

a writing signed by Con–Graph, who gave value, and received rights in the printing press. In support, Color Leasing proffers the security agreement signed by Con–Graph, the promissory note, and the bill of sale.

■■■ There is no question that Color Leasing entered into a written security agreement with Con–Graph, signed by Con–Graph, which described general categories of collateral. The FDIC argues that a security agreement which does not specifically reference the printing press cannot effect a valid attachment. Under the Code, a security interest is not enforceable unless the security agreement contains a description of the collateral. Mass. Gen. Laws ch. 106, § 9–203(1)(a). However, "any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described." *Id.* at § 9–110. "Under this rule, courts should refuse to follow the holdings, often found in the older chattel mortgage cases, that descriptions are insufficient unless they are of the most exact and detailed nature, the so-called 'serial number' test." *Id.* at cmt. to 1972 rev.; *see In re Clinton Hosp. Ass'n,* 142 B.R. 601, 604–5 (Bankr.D.Mass.1992).

The security agreement entered into between Color Leasing and Con–Graph covers "machinery" and "equipment". Such description, while generic, suffices to create a security interest in the printing equipment at issue. *Accord In re Legal Data Sys., Inc.,* 135 B.R. 199, 200–01 (Bankr.D.Mass.1991) (holding that descriptive phrase "all of the Debtor's properties" in security agreement sufficed to create security interest in equipment); *Nat'l Cash Register Co. v. Firestone & Co., Inc.,* 346 Mass. 255, 259, 191 N.E.2d 471 (Mass.1963) (holding security agreement's recital of "All contents of luncheonette including equipment" broad enough to include cash register); *Fed. Deposit Ins. Corp. v. Hill,* 13 Mass.App.Ct. 514, 517, 434 N.E.2d 1029 (Mass.App.Ct.), *appeal denied,* 386 Mass. 1104, 440 N.E.2d 1177 (1982).

1990 at the latest) predates the amendment, the Court will apply the pre-amendment period of ten days. In any event, even if the twenty day

period applied, it would not alter Color Leasing's perfection status.

■ Nor is it disputed that Con–Graph gave value for and received rights in the printing press. Instead, the FDIC challenges the existence of a continuing debt in the printing press by asserting that the bill of sale, *dated December 31, 1987,* and the promissory note and the security agreement, both *dated December 31, 1988,* are unrelated transactions involving different subject-matters. In support, the FDIC points to the bill of sale which states: "in consideration of Three Hundred Sixty Thousand ($360,000) Dollars *paid* by [Con–Graph], . . ., the receipt whereof is hereby acknowledged, . . . ." Pl.'s Mem. in Supp. of Mot. for Summ. J., Ex. A (emphasis added). The FDIC argues that this phrase could reasonably be read to describe a transaction concluded on December 31, 1987, creating no debt upon which a security interest could attach.

In response, Color Leasing offers the affidavit of Mr. Charles A. Goglia, Jr., the attorney who prepared the bill of sale, the promissory note, the security agreement, and the financing statement here at issue. Goglia states that those instruments all pertain to the sale, financing, and security of the same printing press, Goglia Aff. at ¶¶ 7–9, and all, save the financing statement, were executed in conjunction, on December 31, 1988, *id.* at ¶ 10. More importantly, Goglia states:

> I prepared these documents in December, 1988. When I prepared the bill of sale, I made some revisions to a form bill of sale I had in my files. Those revisions included changing the date of the 'form' instrument from November of 1987 to December 31, 1988. Apparently, the '1988' revision did not make it to the final version due to a clerical error. I forwarded the bill of sale with a December, 1987 date along with the security agreement dated December, 1988 (the correct date) and promissory note dated December, 1988 (the correct date) to Color Leasing 3 for execution.

*Id.* at ¶ 8. In addition, Color Leasing has supplied the Court with the form bill of sale containing Goglia's markings for revision. Indeed, the terms "November" and "one thousand nine hundred and eighty-seven" on the form are crossed out and respectively replaced with "December" and "one thousand

nine hundred and eighty-eight". Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J., Ex. A. To further evince Con–Graph's continuing debt in the printing press, Goglia states that Con–Graph made the periodic payments to Color Leasing as required under the promissory note, in the same amounts specified by the bill of sale. *Id.* at ¶ 11.

In reply, the FDIC offers nothing more than its earlier mantra: the date stated on the bill of sale is the date of the sale.

Insofar as it relates to attachment, the date on the bill of sale is a red herring. There is no contemporaneous execution rule under the Code which would hinder attachment simply because a bill of sale, upon which a promissory note is later executed, predates the execution of a security agreement. The position that a creditor does not give value when it takes a security interest to secure a pre-existing claim against a debtor has been rejected by numerous courts. White & Summers, *Uniform Commercial Code* at § 31–6, p. 123 (compiling cases).

As to the conclusory language in the bill of sale, Color Leasing has proffered unrebutted evidence demonstrating that, in fact, Con–Graph did not tender the purchase price upon execution of the bill of sale, but instead exchanged a promise to pay in the form of the promissory note. Summary judgment is a procedure that involves shifting burdens between the moving and the nonmoving parties. Once the moving party avers an absence of evidence to support the opposing party's case, the onus falls upon the opposing party who must confront the motion by presenting facts that show that there is a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *see* Fed. R.Civ.P. 56(e). To oppose the motion successfully, that party "may not rest upon the mere allegations or denials of . . . [its] pleading." Fed.R.Civ.P. 56(e); *see Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Here, Color Leasing has demonstrated an absence of genuine issues as to the valid attachment of a security interest in the printing press. The FDIC cannot conjure a genuine issue simply by pointing at the word "paid" in a form bill of sale and then wondering aloud whether

Con–Graph in fact paid the full purchase price at that time.

■ The FDIC's challenge to attachment is also problematic when weighed against the underlying policies of section 9–203. As a general matter, specificity in the signed-writing requirement serves two functions. Section 9–203 is primarily a statute of frauds designed to protect the debtor. White & Summers, *Uniform Commercial Code* at § 31–3, p. 99. To a lesser degree, it also serves a notice function to protect third-party creditors. *Id.*

> Although the filed financing statement serves the primary notice function, the Code envisions that its inspection will be only the first step in discovering the debtor's affairs. Although the Code facilitates the discovery of additional information without requiring that one examine the security agreement, a look at the signed security agreement is a logical second step. [In the case of a debtor in bankruptcy], [b]ecause third parties (the trustee, other creditors, buyers, etc.) were not privy to the disputed deal, they need information bearing on the intentions of the contracting parties. There is good reason to require that such information be *in writing*. This effectively precludes collusion between the debtor and secured creditor as well as misrepresentations (or at least 'fudging') as to party intentions at the time of the deal.
>
> . . . . .
>
> Despite the virtues of specificity, we believe that courts should generally be lenient in upholding writings, signatures, and descriptions under 9–203 against third-party attack. The proper inquiry is whether the documents would be misleading to a reasonable hypothetical third party reading them. The Code does not require that the party attacking the security agreement prove not only that the document was misleading but that he read it, was misled, and relied.

*Id.* at pp. 99–100 (footnotes omitted). Many courts have rejected formalistic challenges upon a security agreement by third parties where the goal of third-party protection is not advanced. *Id.* at p. 100 n. 9. In this case, the FDIC's challenge furthers no goal beyond its desire to raise a trialworthy issue. In this case, the Bank perfected its security interests in Con–Graph's after-acquired assets long before Color Leasing became Con–Graph's purchase money secured creditor; as such, no amount of descriptive notice in the Color Leasing/Con–Graph agreement could have affected the Bank's antecedent loan decisions.

Therefore, I find that Color Leasing effected a valid attachment of a security interest in the printing press and, furthermore, that such interest is a purchase money secured creditor because Color Leasing retained an interest in the collateral itself to secure all or part of its price. *See id.* at § 9–107(a).

**B. Perfection.**

■ Perfection is the method by which a secured creditor seeks to establish priority over other secured creditors. In cases (such as this one) where perfection requires the filing of a financing statement with the appropriate state or local agency, the general rule is "first-in-time, first-in-right." *See* Mass. Gen. Laws, ch. 106, § 9–312(5)(a). Here it is undisputed that the Bank was the first to file a financing statement reflecting its security interest in Con–Graph's after-acquired equipment. Therefore, under the general rule the Bank's interest would receive priority. However, section 9–312(4) excepts the purchase money secured creditor in equipment from the general rule and confers upon that special creditor priority over a conflicting security interest in the same collateral or its proceeds "if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days thereafter." *Id.* at § 9–312(4).

The question of perfection boils down to: when did Con–Graph, as debtor, possess the printing press? Color Leasing argues that such possession began on December 31, 1988, the date on which it claims the bill of sale, the promissory note, and the security agreement were executed with Con–Graph. The FDIC argues that Con–Graph became a debtor in possession on December 31, 1987

because the bill of sale bears that date. To overcome that fact, Color Leasing again offers the previously discussed testimony of Mr. Goglia. Despite the fact that his affidavit, along with other independent circumstances in the record, lends strong support to the existence of a typographical error, the Court is unable to find that, as a matter of law, the bill of sale was executed on any other day than December 31, 1987.

Color Leasing is left to argue that, irrespective of when Con–Graph executed the bill of sale, Con–Graph's possession as debtor did not begin until the execution of the promissory note and the security agreement on December 31, 1988, thereby rendering its January 5, 1989 filing timely. The FDIC counters that possession began upon Con–Graph's physical possession of the printing press as lessee or, at the latest, on December 31, 1987, the date which appears on the bill of sale.

The Code defines the term "debtor" as "the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral,...." *Id.* at § 9–105(d). The Code does not define the term "possession".

To resolve the question of possession under section 9–312(4) the parties entreat the Court to apply superficially divergent approaches. Color Leasing cites the Ninth Circuit's approach in *Brodie Hotel Supply, Inc. v. United States,* and its progeny, under which possession begins with the creation of the debtor-creditor relationship. *Brodie Hotel Supply,* 431 F.2d 1316 (9th Cir.1970) (debtor in physical possession of the collateral prior to completion of sale not deemed in "possession" until the execution of chattel mortgage and bill of sale, the date on which debtor owed creditor obligation to perform); *see In re Ultra Precision Indus., Inc.,* 503 F.2d 414 (9th Cir.1974); *In re Prior Bros. Inc.,* 29 Wash.App. 905, 632 P.2d 522 (1981); *Rainier Nat'l Bank v. Inland Mach. Co.,* 29 Wash.App. 725, 631 P.2d 389 (1981); *Commerce Union Bank v. John Deere Indust. Equip. Co.,* 387 So.2d 787 (Ala.1980).

In the *Brodie Hotel Supply* case, a hotel began negotiating with Lyons in June 1964 to sell a restaurant located in the hotel during which time Lyons was permitted to operate the restaurant. On November 2, 1964, Lyons borrowed seventeen thousand dollars from a bank in exchange for a security interest in restaurant equipment owned by the hotel but in his physical possession. On November 12, 1964, Lyons executed the purchase of the restaurant and pledged the restaurant equipment as security for the note the hotel received as part of the purchase price. The hotel filed its financing statement within ten days. The Ninth Circuit held that, although Lyons may have been liable for reasonable rent on the equipment or for its return to the hotel, Lyons did not become a debtor in possession until he owed performance to the hotel on the obligation arising under the *completed* sales transaction. "Until that obligation came into being, Lyons was not [the hotel's] debtor with power to mortgage the restaurant equipment as collateral for the unpaid purchase price." *Brodie Hotel Supply,* 431 F.2d at 1318.

The Ninth Circuit soon revisited its position in a case where Wolf delivered shipments of machinery to Ultra under a proposed sale agreement permitting a reasonable testing period prior to acceptance and execution of security agreements. *In re Ultra Precision Indus., Inc.,* 503 F.2d 414. Ultra later accepted the machines and executed security agreements which were reflected in Wolf's financing statement, filed within ten days thereafter. The court held that Ultra did not become a debtor until it executed and delivered the security agreements, which happened to occur after it tested and accepted the machines. Until that time, "Wolf held no definitive security interest in the machines which could be perfected by the filing of a Financing Statement, and ... Ultra held no assignable legal interest in the machines which could fall into the grasp of [the after-acquired secured creditor]." *Id.* at 417. Under the *Brodie Hotel Supply* line of cases, despite the antecedent delivery or simple physical possession of goods by the debtor-to-be, possession under section 9–312(4) does not run until the execution of debtor's obligation to per-

form. *See* White & Summers, *Uniform Commercial Code* at § 33–5, n. 30.

■ In the instant case, it is undisputed that Con–Graph held physical possession of the printing press well before it executed the bill of sale, the promissory note, or the security agreement. Given this critical similarity with those cases following *Brodie Hotel Supply,* an application of that rule is warranted here. In doing so, however, there is a question as to whether the debtor-creditor relationship arose between Con–Graph and Color Leasing upon execution of the bill of sale (December 31, 1987) or upon execution of the promissory note and security agreement (December 31, 1988). The bill of sale effected the conveyance of title in the printing press to Con–Graph. The promissory note effected the debt, as a promise by Con–Graph to pay a specified sum at specified time intervals to Color Leasing. Only upon execution of the latter, on December 31, 1988, was Con–Graph obliged to perform. At that instant, Con–Graph became a debtor in possession and the grace period commenced. Having filed the necessary financing statement six days later, Color Leasing enjoys timely perfection and, accordingly, priority over the Bank's perfected security interests.

The FDIC urges a different approach, employed by the Fourth Circuit and progeny which, in certain instances, focuses upon when the debtor obtains simple, physical control of the collateral. *In re Automated Bookbinding Serv., Inc.,* 471 F.2d 546 (4th Cir.1972). In *Automated Bookbinding,* debtor and seller executed purchase and security agreements approximately five months prior to delivery of the first components of bookbinding equipment. According to the terms of the agreement, debtor's acceptance of the equipment was conditioned upon a reasonable opportunity for debtor to run installation and operation tests and thereafter acknowledge its satisfaction with the equipment. Seller filed its financing statement thirteen days after the final delivery of component parts, but before debtor

had completed its testing. The Fourth Circuit panel held that the ten day grace period under section 9–312(4) ran from the day when debtor received possession of the final delivery. *Automated Bookbinding,* 471 F.2d at 553. The panel's chief concern was that the secured creditor, by manipulating the completion of delivery, could indefinitely delay the time in which to perfect its security interest. *Id.*

However, an application of the rule set forth in *Automated Bookbinding* requires more than bare possession on the part of the debtor; it requires possession plus title or a sales contract or a security agreement, depending on the specific facts of a given case. *Equip. Fin. Group, Inc. v. Traverse Computer Brokers,* 973 F.2d 345, 349 n. 5 (4th Cir. 1992); *see Automated Bookbinding,* 471 F.2d at 553 n. 14 (distinguishing *Brodie Hotel Supply* on the ground that the debtor in that case had physical control of the goods *before* they were sold to him by the holder of the purchase money security interest and before the execution of the security agreement). Thus, *Automated Bookbinding* is not apposite to a case in which the debtor, like Con–Graph or the debtor in *Brodie Hotel Supply,* had physical control of the collateral prior to the execution of debt-creating instruments. Again, we return to the ultimate issue: when did Con–Graph become a debtor in possession? Clearly, Con–Graph possessed the printing press as lessee in 1980. Also we must assume that the Bank received title to the printing press on December 31, 1987. However, Con–Graph only became indebted to Color Leasing when it executed the promissory note on December 31, 1988.[5]

## C. Good Faith.

■ "Every contract or duty within [the Code] imposes an obligation of good faith in its performance or enforcement." Mass. Gen. Laws ch. 106, § 1–203. The term "good faith" means "honesty in fact in the conduct or transaction concerned." *Id.* at § 1–201(19). In the case of a merchant, good faith also requires the "observance of reason-

5. At this point the FDIC might argue that Con–Graph became a debtor in possession once it received title in the printing press because possession plus title satisfied the threshold require-

ment for the *Automated Bookbinding* panel. However, that case is again unpersuasive because there title was transferred to the debtor in conjunction with the debt-creating instrument.

able commercial standards of fair dealing in the trade." *Id.* at § 2–103(b).

The FDIC claims an absence of good faith in the conduct of Color Leasing which, if sufficiently established by the evidence, should permit the Court to reorder the priorities established under section 9–312(4). In support, the FDIC cites: *Shell Oil Co. v. Mills Oil Co., Inc.,* 717 F.2d 208, 212 (5th Cir.1983); *Thompson v. United States,* 408 F.2d 1075, 1084 (8th Cir.1969); *Graniteville Co. v. Bleckley Lumber Co.,* 687 F.Supp. 589, 592 (M.D.Ga.1988).

Notwithstanding those cases, it is unclear whether a lack of good faith in this context is at all material. One of the Code's leading commentators has expressed "grave reservation" regarding cases where courts apply the equitable principle of good faith to create special rules of priority. White & Summers, *Uniform Commercial Code* at § 33–20, p. 377–78 (White believes it "[b]etter to leave an occasional widow penniless by the harsh application of the law than to disrupt thousands of other transactions by injecting uncertainty and by encouraging swarms of potential litigants and their lawyers to challenge what would otherwise be clear and fair rules"; Summers, however, deems those cases correctly decided). Unfortunately, the Court is unaware of any Massachusetts or First Circuit decision on this point.

In any event, even assuming the materiality of good faith, the FDIC's argument fails to raise a genuine issue. The FDIC alleges that the Color Leasing limited partnership lacks good faith in its attempt to enforce whatever security interest it may hold in the printing press by virtue of its close relationship with the Con–Graph corporation. The FDIC claims that, through joint control, certain individuals manipulated the two entities in order to circumvent the Bank's rights in the printing press. Specifically, the FDIC states that Charles Fox is a general partner of Color Leasing as well as the president, treasurer, and one-third shareholder of Con–Graph, and that George Comeau and Frank Nappa are limited partners of Color Leasing as well as owners of a one-third interest each in Con–Graph. The FDIC infers that, based upon these overlapping relationships, the three individuals knew of the Bank's security interests in Con–Graph's after-acquired property, knew of Con–Graph's financial problems, and knew that the Bank would seize the printing press if Con–Graph defaulted on the Bank's loans. Therefore, the FDIC concludes, Color Leasing lacked good faith in its attempt to attach and perfect a purchase money security interest in the printing press. The FDIC urges the Court to alter the priorities assigned under section 9–312(4).

At the hearing on these motions, Color Leasing partially refuted the FDIC's factual rendition when its counsel stated that Fox, Comeau, and Nappa are general partners of the Color Leasing partnership, along with fourteen limited partners. This structural depiction of the partnership is supported by the Goglia Affidavit. Goglia Aff. at ¶ 3. Presumably, Color Leasing offers this point in order to demonstrate that Fox's, Comeau's, and Nappa's ability to control the Color Leasing partnership was not absolute, but rather shared with others who had no connection to Con–Graph.

Even adopting the FDIC's version of Color Leasing's structure, the FDIC fails to raise a triable issue as to a lack of good faith. The most pertinent case cited by the FDIC is *Thompson v. United States,* 408 F.2d 1075 (8th Cir.1969). In that case, third-party developers built an apartment complex with the aid of a construction loan guaranteed by the Federal Housing Administration ("FHA") and secured by a mortgage on the property. The developers agreed to be bound by an FHA regulatory agreement restricting their right to disburse funds from the income of the mortgaged property. The developers transferred their interest to the Thompson family partnership which assumed the obligations of the regulatory agreement and mortgage. The mortgage gave the government a security interest in, inter alia, the furniture pursuant to an after-acquired property clause. Soon after defaulting on its loan payments the Thompson family partnership executed a security agreement in favor of the Thompson family corporation on the furniture located throughout the apartment complex, thereby breaching the regulatory

agreement not to encumber any of their mortgaged property without the FHA's approval. The family corporation then attempted to enforce its security interest against the United States Federal Housing Commissioner, as the Eighth Circuit panel concluded, in bad faith. *Id.* at 1084–85. Of key importance to the court was that one individual in particular, Vance Thompson, dominated both the family partnership and the family corporation and manipulated them to breach the regulatory agreement. *Id.* The court stated that good faith would have required the Thompson family entities to abide by the underlying contractual agreements. *Id.* at 1085. Finding that section 1–203 permitted the consideration of a lack of good faith by the Thompson entities towards the government to alter the erstwhile priorities under Article 9, the court bestowed priority upon the government's technically inferior security interest in the furniture.

 Even if this case were followed in the First Circuit, it is distinguishable from the present set of undisputed facts. While certain individuals may control the helms of both Color Leasing and Con–Graph, they do not do so to the same extent as the individual Vance Thompson. In addition, Color Leasing has committed no breach of an underlying contract with the Bank or the FDIC akin to that in *Thompson.* Here, the FDIC's bad faith argument is that Fox, Comeau, and Nappa knew of the Bank's security interests in Con–Graph's after-acquired property, knew of Con–Graph's financial problems, and knew that the Bank would seize the printing press if Con–Graph defaulted on the Bank's loans. However, the finding of bad faith in *Thompson* involved much more than mere knowledge of a pre-existing security interest in after-acquired property on the part of the subsequent creditor. Indeed, section 9–312 contains "no requirement that the purchase money secured party be without notice or knowledge of the other interest; he takes priority although he knows of it or it has been filed." Mass. Gen. Laws ch. 106, § 9–312, note on the purpose of the 1972 rev., ¶ 3 (Supp.1997). I find that the FDIC's claimed lack of good faith on the part of Color Leasing is insufficient to alter the priority of

Color Leasing's purchase money security interest.

 A plaintiff asserting a claim for conversion under Massachusetts law must demonstrate that: (i) the defendant intentionally and wrongfully exercised control or dominion over personal property; (ii) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (iii) the plaintiff was damaged by the defendant's conduct; and (iv) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused. *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops,* 4 F.3d 90, 95 (1st Cir.1993) (citing *Magaw v. Beals,* 272 Mass. 334, 172 N.E. 347 (Mass.1930)). "It is no defense to an action for conversion that a defendant who exercised dominion over the goods did so in good faith reasonably being mistaken in thinking the facts to be such as would give him a legal right to the goods." *Row v. Home Sav. Bank,* 306 Mass. 522, 525, 29 N.E.2d 552 (Mass.1940) (compiling cases). Nor does the exercise of due care excuse a conversion. *Id.*

The evidence establishes beyond dispute that the Bank intentionally exercised control over the printing press when it seized the collateral for its foreclosure sale. Moreover, since Color Leasing held a superior interest in the printing press as a purchase money secured creditor, the Bank's exercise of control was wrongful. It is undisputed that Color Leasing's demand for return was refused. Nor is it disputed that Color Leasing has been damaged by the Bank's conduct. Therefore Color Leasing's motion for partial summary judgment on its claim for conversion should be granted.

### THE FDIC'S MOTION.

The FDIC moves for summary judgment on the two claims set out in the complaint. As to the claim for conversion the FDIC restates the arguments which it relied upon in opposition to Color Leasing's motion for partial summary judgment. Reciprocally, Color Leasing opposes the FDIC's motion with arguments similar to those employed in support of its motion for partial summary

judgment. Here, the respective burdens shift and the FDIC's legal assertions are now tested against the undisputed facts.

## A. Conversion.

Summary judgment on Color Leasing's claim for conversion requires the FDIC to establish the priority of the Bank's security interest in the printing press. However, such a showing was unobtainable even when the inferences were drawn in its favor. Now, drawing all reasonable inferences in Color Leasing's favor, the Court assumes the existence of a typographical error in the bill of sale. As the preceding discussions demonstrate, Color Leasing has presented enough evidence to prove its status as a perfected purchase money secured creditor. It necessarily follows, therefore, that Color Leasing is able to, *at the very least,* raise genuine issues of material fact to preclude the FDIC from partial summary judgment on the claim for conversion.

The FDIC filed an amendment to its motion for summary judgment. Therein, the FDIC calls attention to an exhibit indicating that, at some point, Con–Graph gave the Bank another blanket security interest in after-acquired collateral including the printing press. Citing to no authority, the FDIC proposes that Color Leasing should be estopped from claiming that it held a security interest in the same printing press. The relevance of estoppel here is unclear. Moreover, this argument completely ignores the Code's conferral of special priority on purchase money secured creditors in section 9–312(4).

6. That section states, in pertinent part:

(e) **Agreements against interests of Corporation.** (1) In general. No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 11 [12 U.S.C. § 1821], either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
 (A) is in writing,
 (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

## B. The *D'Oench, Duhme* Doctrine.

As its fall back position, the FDIC argues that the doctrine set forth in *D'Oench, Duhme & Co., Inc. v. Fed. Deposit Ins. Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), along with its statutory counterpart at 12 U.S.C. § 1823(e), bars Color Leasing from enforcing against the FDIC its security agreement with Con–Graph. In *D'Oench, Duhme,* the FDIC acquired a note from a failed bank in a purchase and assumption transaction and subsequently brought an action against the maker of the note to collect on it. The maker defended by alleging that it had an undisclosed agreement with the bank that the note would never be called for repayment. The United States Supreme Court refused to allow the maker to defend against the FDIC's action on the basis of this secret agreement. *D'Oench, Duhme,* 315 U.S. at 461, 62 S.Ct. at 681. Title 12, section 1823(e) codified *D'Oench, Duhme.*[6] Though it is unsettled whether the common law doctrine and its statutory counterpart are coextensive, this case does not require the Court to resolve that narrow issue.[7]

Over the years, courts have significantly broadened the scope of protection which the doctrine provides the FDIC. It should be noted that the doctrine does not require a showing of fraud, *Langley v. Fed. Deposit Ins. Corp.,* 484 U.S. 86, 93, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987), and it now applies to affirmative claims, as well as to defenses, in contract *and* tort actions. *Timberland Design. Inc. v. First Serv. Bank for Savings,* 932 F.2d 46, 49–50 (1st Cir.1991).[8]

(C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board committee, and
(D) has been, continuously, from the time of its execution, an official record of the depository institution.
12 U.S.C. § 1823(e)(1).

7. The common law doctrine and the statute will be collectively treated as the *D'Oench, Duhme* doctrine.

8. Color Leasing cites *Astrup v. Midwest Fed. Sav. Bank,* 886 F.2d 1057, 1059–60 (8th Cir.1989) to support its argument that *D'Oench, Duhme* does not bar tort claims against the FDIC. That posi-

The purpose of *D'Oench, Duhme* is to allow the FDIC to make a speedy and accurate determination of an insolvent bank's value. *Langley,* 484 U.S. at 91, 108 S.Ct. at 401. Thus, "it is important that FDIC officials, examining the insolvent bank's documents, feel they can rely, for valuation purposes, upon the bank's documents as meaning what they say." *Bateman v. Fed. Deposit Ins. Corp.,* 970 F.2d 924, 928 (1st Cir.1992).

> Potentially prior *secured* interests, however, are not the *kinds* of interests that the FDIC examiner need (or would) necessarily rely upon the bank's documents to reflect. Such interests are not those *of* the bank; they are not contained in documents filed *with* the bank. Nor are they otherwise difficult to find. Indeed, like the mechanic's lien here at issue, they are typically on file at local recording offices or available through checking with, say, the Internal Revenue Service (for tax liens). Thus, it is not surprising that courts have uniformly respected secured-interest priorities, *whether or not* the bank has copies complying with *D'Oench, Duhme.*

*Id.* at 928–29 (emphases in original) (citations omitted).

In *Bateman,* property owners borrowed money from a bank for which they gave a mortgage. Later, a construction company performed some work on the land for which it was never paid. The company then perfected a mechanic's lien by filing the necessary certificate with the county registry of deeds. The company sued to enforce the lien, at a time when the bank was moving to · foreclose on the mortgage, claiming its priority over the pre-existing mortgage. Later, the bank failed and the FDIC took over as receiver. The First Circuit held that section 1823(e) did not deny a right to payment under a pre-existing mechanic's lien when state law would recognize the mechanic's lien as valid, even where the statutory requirements of section 1823(e) had not been met. *See id.* at 927–29.

A line of reasoning parallel to that set forth by then Chief Judge Breyer in *Bate-*

*man* obtains in this case. Color Leasing is not the Bank's borrower, but rather holds a valid purchase money security interest in a printing press which it sold to a borrower, Con–Graph. As such, Color Leasing's interest in the printing press is not an interest of the Bank. Moreover, like a mechanic's lien, a purchase money security interest is fairly simple to track through the appropriate recording office of a state secretary. Indeed, it appears that the Bank here had no such difficulty. On November 14, 1991, shortly following Con–Graph's loan default, the Bank notified Color Leasing, among other interested creditors, of its plan to seize and sell certain Con–Graph collateral, including the printing press. Such ability to discern Color Leasing as an interested creditor demonstrates that Color Leasing's security agreement with Con–Graph was far from secret. *D'Oench, Duhme* should not bar the claim for conversion against the FDIC because the security agreement executed between Color Leasing and Con–Graph is simply not the sort of "secret agreement" contemplated under the *D'Oench, Duhme* doctrine.

### C. Intentional Interference With Contractual Relations.

The FDIC has also moved for partial summary judgment on Color Leasing's claim for intentional interference with contractual relations. To recover on such claim a plaintiff must demonstrate that: (i) he had a contract with a third party; (ii) the defendant knowingly induced or caused the third party to break that contract; (iii) the defendant's interference, in addition to being intentional, was improper in motive or means; and (iv) he was damaged by the defendant's conduct. *G.S. Enters., Inc. v. Falmouth Marine, Inc.,* 410 Mass. 262, 272, 571 N.E.2d 1363 (Mass. 1991).

▮▮▮ The FDIC challenges Color Leasing's legal basis for bringing such a claim with a vague, unsupported estoppel argument which focuses upon Charles Fox's dual role as president of Con–Graph and general partner of Color Leasing. On April 10, 1991,

tion has been explicitly rejected by the First Circuit. *See Timberland Design,* 932 F.2d at 50

n. 4.

Fox agreed to a conditioning of the renewal of the Bank's lines of credit to Con–Graph. Based upon this action, the FDIC argues that Color Leasing is somehow barred from asserting an intentional interference with contractual relations claim against the FDIC for the Bank's wrongful control and sale of the printing press. Frankly, the Court is puzzled by this contention and considers it meritless.

## MOTION TO STRIKE.

 In addition to its motion for partial summary judgment, Color Leasing moves to strike as inadmissible portions of the affidavit of Mr. Howard N. Gorney, one of the Bank's attorneys, on the ground that the disputed portions do nothing more than offer Mr. Gorney's legal conclusion that Color Leasing holds an inferior security interest in the printing press. The FDIC objects on the ground that Color Leasing should somehow be deemed to have admitted the contents of the Gorney affidavit since Color Leasing cited a November 21, 1991 letter containing expressions of the same legal opinions.

Mr. Gorney, a non-expert witness, testifies that he reviewed the relevant documents and has concluded that the Bank holds a superior security interest and that Color Leasing failed to perfect a purchase money security interest. Without wasting much time on this minor issue, it should suffice to say that such legal conclusions are clearly inadmissible and, what's more, the Court disagrees with them. The motion to strike should be granted.

## CONCLUSION.

For the foregoing reasons, Color Leasing's motion for partial summary judgment on its claim for conversion should be granted, and defendants' motion for summary judgment on the claims for conversion and intentional interference with contractual relations should be denied. Color Leasing's motion to strike should also be granted. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Fed.R.Civ.P. 72(b); Local Rule of Court 32. Failure to file specific objections in a timely

manner constitutes a waiver both of the right to review by the district court, *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir.1980), and the right to appeal the district court's decision, *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986) (per curiam).